GREAT LAKES S. S. CO. v. PITTSBURGH S. S. CO.

(Circuit Court of Appeals, Sixth Circuit. May 4, 1915.)

No. 2573.

COLLISION ⊗⟶91—STEAM VESSELS MEETING ON CONVERGING COURSES—FAULT.

A collision between the steamer Ellwood, down-bound, when turning eastward into Lake Erie at the south end of the Detroit river channel in the night, and the steamer Brower, up-bound from Toledo, *held* due solely to the fault of the Brower in keeping too far to the eastward, instead of turning northward in the channel in the usual and proper course and as required by the passing agreement of two whistles, made when the vessels were a mile or more apart.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 187–192; Dec. Dig. ⊗⟶91.

Collision, signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; William L. Day, Judge.

Suit in admiralty for collision by the Pittsburgh Steamship Company, owner of the steamer Ellwood, against the steamer Brower, the

Great Lakes Steamship Company, claimant, with cross-libel against the Ellwood. Decree for libelant, and the claimant of the Brower appeals. Affirmed.

For opinion below, see 201 Fed. 588.

On the night of August 27, 1907, the steamer Ellwood, a 6,000-ton boat, 478 feet long, the property of the Pittsburgh Steamship Company, and the steamer Brower, owned by the Great Lakes Steamship Company, 346 feet long and of 3,500 tons, were in collision at a point in Lake Erie a little outside the mouth of the Detroit river. The Ellwood was bound down the lake, for Lorain, via Colchester Light; the Brower was up-bound, from Toledo. Both were loaded so that they were drawing about 19 feet. The Ellwood libeled the Brower to recover her damages of about $34,000, and the Brower cross-libeled for $22,000 damages. The District Court held the Brower solely at fault; and the Brower appeals.

The situation can be understood by reference to the sketch on the following page. The so-called Detroit river light was a considerable distance out in the lake from the river's mouth, and the water on all sides was about 20 or 21 feet deep, with an occasional shoal spot; but in order to get the best water it was customary for down-bound vessels to pass the red gas buoy on the port, the Detroit river light on the starboard, and then to continue in a general southeasterly direction for a distance before diverging on their desired courses, which might vary from southwest around to nearly east. The official lake survey charts had adopted, as an aid to navigation, an arbitrary point of divergence 2,500 feet S. E. by E. from the light, and from this point, indicated the various courses by dotted lines. These dotted lines do not, however, imply either obligation or custom to make the turn at the point indicated; they only generally indicate the proper use of bearing points and compass. Up-bound boats followed the approximately reverse courses. A boat from Toledo, with the draft of the Brower on this occasion, could have gone entirely to westward of the light, or close to it on the southeasterly side; but it was usual for such a boat to swing into the channel of the best water at some distance southeasterly from the light—it did not make much difference where—and then go up, with the light on the port and with the red gas buoy on the starboard.

At this time, the government was engaged in dredging a deeper channel southeasterly from the light. The work was plotted into sections, 800 by 1,000 feet, as shown by the dotted line double rectangles on the sketch; and along the westerly edge of the work five dredges were anchored, practically in line. In order to get into the customary up-bound course, it was necessary for the Brower to go past some of these dredges, and then turn to port to head up for the light; and while she might have swung into the channel closer to the light, it was entirely normal and proper for her to enter, as she did, between dredge No. 9, Starke, and No. 3, Great Lakes. We refer to this area of contemplated deepening, and indicated by the rectangular dotted lines, as the channel, but without intending to imply that it was a channel in any sense, except as being the course in which heavily laden boats could get the best water, and so being a course which they very commonly followed at least 2,500 feet southerly from the light.

All the witnesses agree that when the Ellwood was a little distance above the red gas buoy she observed the lights of the Brower approaching from the direction of Toledo, and a mile or so away from the line of dredges; that the Ellwood gave a two-blast signal, to which the Brower responded with the same signal; that the Ellwood made a turn around the red gas buoy, left the light on her starboard at a distance of 1,000 feet, more or less, and continued a southeasterly course, swinging somewhat—the extent is disputed—to port; that the Brower entered the channel somewhere between the two dredges named, and began heading up for the light, but that the starboarding of one or the other, or both, was insufficient, and they came together; and that the Brower struck the Ellwood a more or less angling blow, causing the Ellwood to sink. As to their exact courses and the various details involved, there is the usual conflict.

H. D. Goulder and Frank S. Masten, both of Cleveland, Ohio, for appellant.

H. A. Kelley, of Cleveland, Ohio, for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). When we fix the point where the collision occurred, it goes far to determine the 'other matters in conflict. This primary fact is ascertainable with less difficulty than usual. The location of the Ellwood, as she lay upon the bottom after the collision, was fixed by survey, and is practically undisputed. Disinterested observers from one of the dredges agree with the Ellwood's crew that she did not go more than a length, and perhaps not more than half a length, after the collision before the sinking of only one or two feet which was necessary to make her rest on the bottom. It is also fairly sure that, at the moment of the collision, her stern was swinging to port, answering an endeavor to make the inevitable blow more glancing, and that the blow itself, received on the starboard quarter, would have accelerated this swing. It is therefore not a matter of serious doubt that her heading had been considerably more to the easterly than it was as she lay sunk, and that the point of collision was just about where it is

indicated on the sketch, and so that there was a distance of not less than 1,000 feet between that point and the line of dredges. Accepting and based upon this theory of the place of collision, we proceed to consider the conduct of the respective boats.

We agree with the court below that the Brower was in fault. When her captain exercised his right of choice and determined to swing into the channel around one of the dredges as far down as the point he selected, he assumed the burden of doing so with all the care required by the fact that another steamer was coming down, and for all he knew, might be bound south or southwest, and might be desiring to go just where the Ellwood did go. That the collision was unnecessary, if the Brower had been careful in this maneuver, is highly probable, if not clear. Her captain says that he began starboarding 2,000 feet before passing the dredges, so as to enter the channel at an angle as small as possible, and constantly continued starboarding and swinging to port until the collision. This is exactly what he should have done, if he was careful, but the place of the collision demonstrates it is what he did not do. If he had thus managed his boat, passing close to dredge No. 9, and perhaps checking, it is difficult to see how there was any occasion for him to pass east of the center of the channel, say 300 feet from the dredge; but the place of the collision was 700 feet further east. The same consideration demonstrates that he could not have materially changed his heading from Toledo until after he entered into the channel between the dredges; if he had, he would necessarily have gone well astern of the Ellwood, if he had crossed her course at all. He knew that he must make a considerable turn, and that his own boat would, and the other boat might, respond to the helm much more slowly than if in deep water. The reasonably clear conclusion is that he was not navigating with close attention to the danger that might be imminent, but was taking it for granted that the Ellwood was much further away than her real position, or would yield much more than any obligation required.

How the conduct of the Ellwood should be characterized is a question of more difficulty. It is forcefully argued that, as the Ellwood knew that the Brower would come up somewhere through these waters, and as the Ellwood's final course was to be easterly, and as she might have turned off in that direction anywhere below the red gas buoy, and as, if she had kept only a little further away from the dredges, the collision would not have occurred, the result is, at least in part, chargeable to her. Particular reliance is placed on the decision of this court in Lake Erie Co. v. Gilchrist Co., 142 Fed. 89, 73 C. C. A. 313, where it was said that the customary course at this point for vessels bound down the lake, was to turn to the east between the gas buoy and the light; and hence it is urged that the Ellwood was away south of her proper place. If the record in this case justified the same conclusion of fact reached in the Lake Erie-Gilchrist Case as to the customary course of down-bound vessels, there would be much strength in this position; but that case involved the sailing course customary at a period several years before the time here involved,

and upon this record, it cannot be doubted that the Ellwood was following a common and natural course for vessels of her draft bound down the lake. Her captain so testified in terms, it can hardly be said that he is contradicted, and his general conclusion is supported by the specific fact that while the Ellwood was on the bottom, more of such vessels passed her on the south than on the north. We must assume, therefore, that she was following a rightful course. It does not follow that she was entitled to navigate without regard to the approach of the Brower; she was bound to know that the Brower might enter this channel and make the turn, and she was bound to leave, not merely sufficient room, but ample room, for that purpose. This we think she did. If the space left for the Brower, in which to make the turn, had been, for example, only 500 feet, it might well be said that, while this was apparently space enough, yet it might not prove so, and that the Ellwood, being able to yield further, could not have been wholly exonerated; but a lack of due care on the part of the Ellwood must rest upon her reasonable anticipations of what the Brower might do, and it cannot be said that there was any duty to anticipate that the Brower would require 1,000 feet of channel in which to make a swing of four points, two points of which ought to have been made before entering the channel at all.

In the Lake Erie-Gilchrist Case, each of the meeting boats had to make the turn between the Detroit river course and the course down the lake, and it was held that the boat which took the customary way and kept her own side of the joint course had a right to assume that the other boat would make the proper turn at the proper point, and would not continue on across the joint course and enter the waters which were, in a sense, appropriated to the first boat. The opinion and the authorities there cited fully and sufficiently cover the questions that here arise, and apply to the fault of the Brower in not turning up into the channel when and as she should have done, and to the right of the Ellwood to believe that the Brower would make this turn, and would not continue on into the course of the Ellwood, and lead to the conclusion that, in relying upon this belief, the Ellwood did not thereby, in blameful degree, contribute to the collision.

It remains only to consider whether the Ellwood should, before it was too late, have observed that the Brower was not meeting this anticipation, but was keeping a course likely to be dangerous, and so whether the Ellwood should have checked or blown an alarm. This query is emphasized by the fact that after the meeting signals were exchanged, but before the Brower entered between the dredges, the lookout of the Ellwood had been recalled from his position at the bow and sent about some other work. We think it should be assumed that the absence of the lookout would be a condemnatory fault, unless it satisfactorily and clearly appears that his presence would have made no difference (The Ariadne, 13 Wall. 475, 20 L. Ed. 542; The Roby [C. C. A. 6] 111 Fed. 601, 612, 49 C. C. A. 481); but we are unable to see any reasonable ground for thinking that the absence of the lookout could have been material. The Brower had already been observed and a meeting agreement had been made, the night was clear,

the Brower's lights were in plain sight, there was no obstruction of any kind, and there was nothing to distract the captain's attention in any other direction. It is obvious from the sketch that, as the Brower entered the channel and began to turn, both her lights would open to the Ellwood, if they were not already open; that this condition would be modified by the forward progress of both boats towards their course intersection; and that the difference in the amount which these two lights would open to the observer on the Ellwood as between a careful and safe turning into the channel and the kind of a turn which actually was made could hardly, for some time, be sufficient, even to an attentive and skilled observer, to show that the Brower was turning so slowly as to be creating danger; nor can we think, when we remember the Ellwood's rightful anticipations as to what the Brower would do, that probable danger should have appeared to the Ellwood's captain, or would have appeared to her lookout, before the time when both boats did appreciate the danger and make the efforts to escape which were then bound to be ineffectual.

The decree below is affirmed.