OTTO MARMET COAL & MINING CO. v. FIEGER-AUSTIN DREDGING CO.*

(Circuit Court of Appeals, Sixth Circuit.  June 3, 1919.)

Nos. 3182-3184.

1. COLLISION ☞71(3), 74, 75—FAULT—DREDGE ANCHORED IN CHANNEL.
    A dredge working in the Ohio river *held* grossly negligent in anchoring at night, with her assistant flats, in the middle of the towboat channel at a dangerous bend, when she had knowledge that a coal fleet was coming down, and in fault for a collision with one of the tows, not only because of the place of anchorage, but also for failure to maintain lights, as required by the rules, or to take any other precautions. The tow *held*, on the evidence, not chargeable with contributory fault.

2. COLLISION ☞145—MUTUAL FAULTS—DIVISION OF DAMAGES.
    When both vessels are in fault for a collision, the damages are to be equally divided, without regard to whether their faults were equal in degree.

3. COLLISION ☞123—ACTIONS—BURDEN AND MEASURE OF PROOF.
    Where the fault of one vessel for collision is clear, and is sufficient to account for the collision, she has the burden of establishing the contributory fault of the other vessel by equally clear evidence.

4. COLLISION ☞73—MOVING AND ANCHORED VESSELS—PRESUMPTION OF FAULT.
    The rule that, in case of collision between a moving and an anchored vessel, the moving vessel is presumed to be in fault, does not apply where the anchored vessel was clearly in fault.

5. COLLISION ☞78—ABSENCE OF LOOKOUT—PRESUMPTION OF FAULT.
    Conceding that in general the absence of a lookout raises a presumption that an ensuing collision was caused or contributed to thereby, such presumption is disputable.

Appeals from the District Court of the United States for the Western Division of the Southern District of Ohio; Howard C. Hollister, Judge.

Suit in admiralty for collision by the Otto Marmet Coal & Mining Company, owner of the steamboat Sallie Marmet, against the Fieger-Austin Dredging Company, owner of the dredgeboat Northern No. 2,

with cross-libel. From a decree dividing damages, both parties appeal. Reversed on libelant's appeal, and affirmed on respondent's appeal.

Charles H. Stephens, Sr., of Cincinnati, Ohio, for libelant.

Lowrie, C. Barton, of Pittsburgh, Pa., for respondent.

Before WARRINGTON and DENISON, Circuit Judges, and COCHRAN, District Judge.

COCHRAN, District Judge. [1] The litigation involved in these appeals grew out of a collision in Manchester chute of the Ohio river, about 73 miles above Cincinnati, near midnight, September 1, 1914, between the towboat Sallie Marmet and her tow, consisting of 13 barges loaded with coal and two flats, owned by the Otto Marmet Coal & Mining Company, which was descending the river, and the dredging plant of the Fieger-Austin Dredging Company, consisting of the dredge Northern No. 2, two flats and scow, which was anchored therein. Each party claimed that the other was in fault and sought damages for the injuries sustained. The lower court held both to have been in fault and divided the damages between them. Each party has appealed from its decree.

The chute is formed by two islands in the river, just above Manchester, Ohio. One, between 1⅓ and 1½ miles long, and called Manchester Island, hereafter referred to as the Island, lies next the Ohio shore. The other, between one-third and one-half miles long and called the Towhead, lies between the upper end of the Island and the Kentucky shore. There is no navigation on the Ohio side of the Island. At the then stage of the water, there was none running between the Island and the Towhead. They were connected by a sand bar. All navigation is next the Kentucky shore, except that in very high water passage may be had between the two islands. It is the portion of the river between the Kentucky shore, and first the Towhead, and then the Island, that is known as Manchester chute. This portion thereof is crooked, narrow, and swift. It has three bends. Two are formed by its course around the Towhead. Above, as you descend, the channel turns to the left—i. e., towards the Kentucky shore—and hugs it, until it gets somewhat below the middle of the Towhead, when it turns to the right and runs towards the Island, around the foot of the Towhead. The latter bend is characterized by the witnesses as a very deep bend, and is caused by a rock or gravel bar extending from the Kentucky shore out into the river. The third bend is caused by a sand bar, which puts out from the lower end of the Island, beginning not far from its middle. The channel here turns to the left, or towards the Kentucky shore, and after hugging that shore for a short distance, when below the Island it turns to the right, or towards the Ohio shore, forming a fourth bend opposite the wharfboat at Manchester. The uncontradicted testimony is that this chute is a very bad place for boats, and particularly towboats, with tows, to navigate. It is the worst place on the Ohio river between the mouth of Kanawha river, the point whence the Sallie Marmet started, and Cincinnati, its destination.

The dredging plant was anchored in about the middle of the river, about opposite the middle of the Island, about 1,200 feet below the Towhead. One witness puts it that it was at the foot thereof. It was not far from, if not right at, the beginning of the third bend; i. e., the place where the channel turns to the left, or the Kentucky shore, because of the sand bar putting out from the lower end of the Island. One flat, a repair flat, was on the Kentucky side of the dredge. The other, a fuel flat, and scow, lying tandem, were on the Ohio side. The stern of the dredge was up river. The width of the dredge and two flats was 68 feet, and the length of the fuel flat and scow 176 feet, which was considerably greater than that of the dredge or repair flat. The distance from the north side of the plant to the water's edge at the Island was 400 feet, and from its south side to such edge at the Kentucky shore was 380 feet, thus making the width of the river at this point 848 feet. The width of the navigable water does not appear.

The dredge was engaged in removing the rock bar, heretofore referred to. It began so to do August 28th, and had been so engaged for four days. It had made two cuts, each about 30 feet wide and over 200 feet long up and down the river, and had nearly completed the third cut. The material so removed was mainly sand, and it was about to enter upon the rock bar, if it had not already done so. The dredge was over the outer edge of the rock bar. There was a rise in the river, just when it began not appearing. The stage at Portsmouth, Ohio, 30 or 40 miles above, was 9 feet 8 inches. The depth over the rock bar where the dredge was located was 8 feet 7 inches, and to the north or the Island side thereof it was 15 feet 4 inches. The dredge was not at work at the time of the collision. It did not work at night. It had a single white light on the upper end of the fuel flat—i. e., on the Ohio side of the dredge—and another on the lower end of the scow. The former could not be seen from below, nor the latter from above. There was no light on the dredge or repair flat on the Kentucky side. The lights were placed on the Island side, because the deep water was there. The work was being done under a contract with the United States, and there was on the dredge at the time a government inspector, Capt. Howard, who supervised the work. The night was a bright moonlight night.

The rise in the river was sufficient to permit Kanawha coal to be transported from the mouth of that river to Cincinnati, and a fleet of tow boats, with tows in charge, took advantage of it. They began to pass through the chute the evening of September 1st, and by 9 o'clock the next morning 7 at least so passed; the Sallie Marmet being the third. They passed in this order: Florence Marmet, J. T. Hatfield, Sallie Marmet, D. T. Lane, Convoy, Dewey, and Matheson 2d. They all seem to have had substantially the same size of tow, though the evidence discloses nothing as to the Convoy and Dewey. The Florence Marmet passed about 9:30 and the J. T. Hatfield about 10. The Leader, a towboat without a tow, passed about 7 p. m. The Leader and the Florence Marmet passed the dredging plant on the left or Kentucky side, and the J. T. Hatfield on the right or Island side. When the others passed, the plant had been removed to the Kentucky shore. A barge of the Sallie Marmet sunk, straight up and down

the river, about 235 feet below where the plant had been and 25 feet nearer the Island. The others passed to the left or Kentucky side of this barge. The Eugene Dana Smith with a tow passed on the morning of September 3d, and it, too, passed to the left, or Kentucky side of the barge. The Leader with a tow of 6 empties passed up on the morning of August 28th, after the plant had been placed, and so did the Val P. Collins with a tow of 14 empties late in the afternoon of August 31st. Each passed to the left or Island side of the plant.

The tow of the Sallie Marmet was arranged in four tiers. The first was composed of three barges and one flat, the latter being on the right or Island side, then the next two of four barges each, and the fourth, next the boat, of two barges and a flat. The barges were 26 feet wide and 126 feet long. This makes the tow 104 feet wide and 504 feet long. The length of the boat does not appear. It is not unlikely that it was sufficient to make the entire length as much as, if not more than, 650 feet. The draft was 6 feet. In the collision the flat in the first tier struck the repair flat of the plant, and the outer barge of the second tier, which was sunk, the dredge. It is likely that, if the repair flat had been removed when it became apparent that a collision was about to take place, it might have been avoided.

In determining who was to blame for the collision, the natural order calls for a consideration first of the part of the operators of the dredging plant in the transaction. The claim is that they were at fault in anchoring at that place at night, and our conclusion is that they were not only at fault in so doing, but grossly so. As heretofore stated, that place was about in the middle of the river. The middle of the river was 6 feet from the Island side of the dredge. It was, however, exactly where, at that stage of water, towboats with tows run; i. e., in what may be termed, as it was by some of the witnesses, the towboat channel. This is established by the testimony of 11 experienced pilots, who saw the dredging plant whilst it was so located, 9 of whom were on the Val P. Collins, Leader, Florence Marmet, J. T. Hatfield, and Sallie Marmet, and 2 of whom were on the Sea Lion, a towboat operated in connection with the dredging plant, then tied to the Kentucky shore, not far away, and 5 other experienced pilots, whose attention was called to its location on the witness stand, and there was no testimony to the contrary.

The claim in behalf of the operators of the dredging plant is that the deep water channel was on the Ohio side thereof. This was undoubtedly the case. But the question here is not where the channel was in extreme low water, when towboats with tows could not navigate; but where did they run when the water was of sufficient height for them to navigate—i. e., where was the towboat channel? And as to that, as stated, it is conclusively established that it was exactly where the dredging plant was located. It is further clearly established by the testimony that the location of the dredging plant at this point endangered the safety of each of the towboats and its tows, which had to pass whilst it was there. It made it a "dangerous maneuver" for a towboat with such tows as these had to attempt to pass it on either side. In passing on the Island or deep water side, two turns were called for, first to the right and then to the left, and the danger was

that in crossing to the Island side, the current would draw the tow or boat down onto the plant, and that, if this danger was escaped, the tow would strike the bar on the lower end of the Island and break it up. In order to make this passage, as one witness puts it, a "very good twister" was needed. The danger in going to the left was two-fold: Of being drawn on to the plant by the current, and of the water over the rock bar not in all places being of sufficient depth to permit passage. Whilst the plant was so stationed the Leader and Val P. Collins in passing up took the Island side, and in passing down the J. T. Hatfield took the same side, and the Leader and the Florence Marmet took the left or Kentucky side. The Sallie Marmet attempted to take the same side; and all the towboats passing afterwards took the left or Kentucky side of the sunken barge. This would seem to indicate that the location of the dredging plant created a difference of opinion amongst the pilots as to which was the best side upon which to make the passage.

On behalf of the operators of the dredging plant it is urged that the right or Island side was the proper side to take, and that there was no risk in taking it. Such was the view of the operators themselves, shown by their placing the lights on that side of the plant. But it is not impossible that they added to the confusion by so doing, and that it would not have been better had they contented themselves with so lighting up the plant that it, and what it was, could be readily discovered, and left it to the experienced pilots, who were thoroughly familiar with the situation, to determine as to the best course to pursue. No doubt, from the distance of the dredging plant to the foot of the Towhead and Island shore and the size of the Sallie Marmet and her tow, it can easily be made out that there was room enough for her to get around that way, and that with comparative safety. But the determination of the risk, if any, incurred in making the attempt to so do, is not entirely a matter of ciphering. The qualities of the boat and her tow, the skill of the pilot, the effect of the current, how soon it was discovered that the plant was in the way of the usual course, and possibly other things, had much to do with the risk so incurred. That the dredging plant endangered the safety of the tow-boats and their tows would seem to have been the opinion of nearly all of the experienced pilots heretofore referred to. There was no substantial testimony to the contrary.

Besides, the effect which the condition of things there existing had upon those who were confronted with it leaves no room for doubt that such was the case. The two pilots in the pilot house of the Val P. Collins, as she with her empties passed up on the Island side the afternoon of August 31st, the day before the collision, discussed between themselves that the dredging plant was in the way, and some one from her hallooed to those on it that they had better get out of the way; that a fleet of Kanawha coal was coming, and that they would get run over. The tow of the Collins passed within 4 or 5 feet of the plant. The pilot of the Leader, as she passed at 7, the evening of the collision, tried to get the window of the pilot house open in order that he might halloo and tell them to get out of the way, as boats were coming down that night, and, either because he could not get

the window open sufficiently or get to his horn in time he was unable to do so, and he thought he heard some one from below halloo that they had better get out of the way, as a lot of boats were coming down that night. Two pilots were in the pilot house of the Florence Marmet as she passed between 9 and 10 o'clock p. m., son and father; the former being at the wheel. The son had a "whole lot of hard feelings" before he got to the plant, and did not know whether he was going to hit it or not. In deciding to go on the Kentucky side, as he gives it, he said to his father, "Father, I don't believe that I can go to the right," and, according to his father, "Pap, we will go down the left there; I expect we will rub, but I will take the chance." And after they had passed he said that they had better get that dredge-boat out of there, for they are liable to get hit with the towboats coming. The tow passed within 25 feet of the plant, and, as the boat got alongside, the son hallooed and told the persons on the dredge that they had it right square in the channel. They said that the channel was on the Ohio side, where the lights were. He replied that it might be for a packet, but not for a towboat, and that they had better get the dredge out of the way, for the rest of the boats were coming, all towboats, to which they responded that they were not in the channel. The pilot of the J. T. Hatfield, which passed on the Island side, gave as his reason for so doing that he was afraid the drift of the water might slide him to the side of the dredge. He passed within 30 or 40 feet. The dangers of the situation scared him. He came to the opinion that some boat was going to hit the dredge where it lay, and so remarked. He thought he was going to strike his whole tow on the Island bar, and had to back three or four times to keep from so doing, and then had to drive so far over to the Kentucky shore, that he could not land a barge which he had for Manchester, without going half a mile below and then towing it back. The pilot of the Sea Lion, late the afternoon of September 1st, when it had been ascertained from the Cincinnati Enquirer that the coal fleet was coming, and he was asked by Capt. Howard for his advice as to whether they should move out of the way, said, "Why, sure I would, for she is right in the way."

There is no accounting for this effect on these experienced pilots of this condition of things, except that the passage of the towboats with their tows was rendered decidedly unsafe by the location of the dredging plant. The operators of the dredging plant knew that this fleet of tow boats with tows was coming in ample time to have gotten out of the way. They ascertained it from the newspaper, at least as early as the late afternoon before the collision. Two of the fleet, to wit, the Florence Marmet and J. T. Hatfield, passed before the Sallie Marmet's turn came. They must have observed the close proximity to the plant in which the tows came, which passed before the collision, and the difficulty which the J. T. Hatfield had in getting by, in passing on the Island side. The Leader, when it passed up on the morning of August 28th, with her 6 empties, on the Island side, also had difficulty in getting by, which also must have been observed. It had to go above the plant, then back, and then throw her head around, in order to get across. However it may have been as to the warning given

from the Val P. Collins as it passed up the late afternoon of August 31st, and from the Leader early in the evening of the collision, the evidence justifies the conclusion that they were aware of the warning to get out of the way given by the pilot of the Sea Lion, late in the afternoon of the collision, and that given by the pilot of the Florence Marmet shortly before. After the latter warning was given there was ample time to have gotten out of the way. The plant could have been moved either by the Sea Lion or by her own steam.

There was no reasonable necessity for the dredging plant to remain where it was during that night, when it was not at work. Indeed, it may be said that there was no reasonable necessity for its being at work there whilst this coal fleet was passing. At most it would take but two days for it to get by. But, however this may be, there was no reasonable excuse for its remaining there, if not at work, whilst this fleet was passing. The only excuse offered is that it would have been difficult to find the place where the plant had quit work. But this is not even plausible. And, if they were to persist in remaining in the way, they should have taken extra precautions, to the end that its presence there would be ascertained by the coming boats at the very earliest possible moment, either by having more lights or by whistling. The single light which it had did not conform to the requirement of the board of supervising inspectors of steam vessels, in that it was not as much as eight feet above the surface of the water. That such was the case appears from the evidence introduced on behalf of the dredging plant. That on behalf of the Sallie Marmet and her tow is very strong to the effect that it was not more than 4 or 5 feet from the water. The less the height such a light is from the water, the more difficult is it to determine the distance from it. This was an additional particular of fault on the part of the operators of the dredging plant. But, instead of either getting out of the way or taking such extra precautions, all on board, save a solitary watchman, retired to their slumbers, leaving it to the operators of the coming towboats to deal with the dangerous situation as best they might.

These considerations drive us to the conclusion that the operators of the dredging plant were at fault, and that grossly so. Their fault consisted of three particulars: They anchored the plant at an improper place without any reasonable necessity therefor. The sole light displayed was not placed at the proper height from the surface of the water. They failed to take the extra precautions which the situation demanded, if they were to remain in that improper place. The first of these faults was the main fault. The other two may be said to have grown out of it. This fault, as may also be said of the second, was a statutory fault, in that it was a violation of section 9920 of the act relating to rivers and harbors, which provided that:

"It shall not be lawful to tie up or anchor vessels or other craft * * * in such manner as to prevent or obstruct the passage of other vessels or craft." 10 U. S. Comp. Stat. 1916, p. 12210; 9 Fed. Stat. Ann. (2d Ed.) p. 60.

That this fault was a violation of this provision is established by the cases cited in the annotation thereof in each of these works. This provision, however, merely emphasizes and is declaratory of the gen-

eral maritime law. There is nothing in the fact that the work was being done under a contract with the government and the supervision of a government inspector, then on the dredge, to relieve the owner of the dredging plant of responsibility for the fault of the operators thereof. The contract required the contractor to do the work in such manner as to obstruct navigation as little as possible, and provided further:

"In case the contractor's plant so obstructs the navigation as to impede the passage of vessels, it shall promptly be so moved as to afford a practicable passage on the approach of any vessels."

And again:

"The contractor will be responsible that his employés observe the laws of the United States, affecting operations under this contract."

We do not understand that it is contended otherwise on behalf of the owner. It is said in its brief:

"But, while the dredge had a lawful right to obstruct navigation, she must obstruct it as little as possible, so as not to impede the passage of vessels."

It must further be held that this fault on the part of the operators of the dredging plant was the efficient and proximate cause of the collision.

[2] This brings us to the question as to whether there was fault on the part of the operators of the Sallie Marmet and her tow. Were they at fault also? And, if so, was such fault on their part contributory to the collision? If these questions are answered in the affirmative, it is immaterial as to the degree of fault as compared with that of the operators of the dredging plant. It counts for nothing that the degree of fault on the part of the latter was the greater. The damages covered by the collision must be divided. The Alabama v. The Gamecock, 92 U. S. 695, 23 L. Ed. 763; The Max Morris (D. C.) 24 Fed. 860; Great Lakes Towing Co. v. Masaba S. S. Co., 237 Fed. 577, 150 C. C. A. 459. In the Scioto, Fed. Cas. No. 12,508, Judge Ware said:

"The whole damage done to both vessels is put into one mass in common, and each pays one-half, without regard to the different values of the vessels, when both parties have been in fault, without attempting to discriminate whether the faults had not been greater on one side than the other."

[3] But in order to this the evidence of such fault on the part of the operators of the Sallie Marmet and her tow must be as cogent as that of fault on the part of the operators of the dredging plant. In The City of New York, 147 U. S. 72, 13 Sup. Ct. 211, 37 L. Ed. 84, it was said by the Supreme Court, through Justice Brown:

"In view of the recklessness with which the steamer was navigated that evening, it is no more than just that the evidence of contributory negligence on the part of the sailing vessel should be clear and convincing. When the fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor."

This court, in the case of Lake Erie Trans. Co. v. Gilchrist, 142 Fed. 89, 73 C. C. A. 313, through Judge Lurton, said:

"The fault of the Mack being established beyond cavil she is not entitled to divide damages with the Rome upon criticism of her management, except upon clear proof of some fault not made in extremis, and reasonable doubt should be resolved in her favor."

And again, in the case of Western Transit Co. v. Davidson, 212 Fed. 696, 129 C. C. A. 232, through Judge Denison, it said:

"That when the primary liability is placed elsewhere the contributing fault must be very clear."

[4] Here the fault of the operators of the dredging plant is beyond cavil. The case of the owner of the Sallie Marmet and her tow against them is established beyond a reasonable doubt. That of the owner of the dredging plant, as against the operators of the Sallie Marmet, must have been established beyond such a doubt, if there is to be division. It must be so established, both that they were at fault, and that the fault on their part contributed to the collision. This is not a case for the application of the principle that, where there is a collision between a moving and an anchored vessel, the presumption is that those in charge of the moving vessel were at fault. That applies only where those in charge of the anchored vessel were not at fault. Here the presumption is that those in charge of the moving vessel were not at fault; and this presumption is aided by the consideration that, at best, Manchester chute was a dangerous place for towboats with tows to pass through. This fact was calculated to make the operators of the Sallie Marmet and tow alert, and to use all the skill at their command in making the passage.

Nine different particulars are pointed out in which it is claimed that these operators were at fault. They were mainly on the part of the pilot; and the faults on his part may be summed up in two—improper navigation after he discovered the light on the dredging plant, and failure to discover it sooner than he did. In judging the pilot's conduct, it is to be borne in mind that he was "in extremis" from the time that he discovered the light. It will be shown later that such was his condition from the time it is claimed that he might have discovered it. But beyond question such was his condition from the time that he actually discovered it. It is difficult to determine the distance the head of the tow was from the plant when he first made the discovery. But, however this may be, this much is certain: He discovered it as soon as he made the turn to cross over towards the Island—i. e., when the plant was directly ahead of him—and he did not discover it sooner; for such was his testimony, and we are limited to this in determining the matter. He testified as follows:

"When I first started from Light No. 2 backing, to throw my head up, the steamboat was lying out in this direction, and the tow pointed to the Kentucky shore. By the time I got through backing to throw my head up, the steamboat was lying in the bend. That is when I discovered the light; when I threw my head up. That throws the steamboat down in the bend, and the head of my tow was pointing towards Manchester Island, the Ohio shore."

From that time at least he was in extremis, and, this being so, no mere error of judgment on his part as to what was best to do can be attributed to him as a fault. The main particular in which it is claimed that the pilot was in fault in navigation after such discovery was in not attempting to pass the plant on the right or Island side, and it is urged that he was headed so to do, and changed therefrom to the left or Kentucky side. Such, however, was not the case. He was headed for the plant, and what he did was to choose to attempt to make the passage on the left or Kentucky side, rather than on the right or Island side. The most that it is possible to say is that this was an error of judgment. The Leader and the Florence Marmet chose the same course, and all the rest which passed after the collision went to the same side of the sunken barge. But it seems to us that there was not even any error of judgment in making this choice. It is true that the Leader as she went up on August 28th, the Val P. Collins, and the J. T. Hatfield got around safely on the other side. But both the Leader and the J. T. Hatfield had trouble in so doing, and the tow of the Val P. Collins missed the dredge only 5 feet. To make that side called for two turns, whereas to make the left or Kentucky side called for only one, and as it turned out the depth of water over the rock bar was sufficient to permit a passage without rubbing it.

Before the pilot discovered the light, he had been backing; i. e., operating his engines reversed. As soon as he discovered it, he backed full headway, and continued so to do until the collision took place, in an effort to swing the head of the tow from the plant. It is urged as a further fault in the navigation that the pilot succeeded before the collision in swinging the head of his tow clear of the plant, and that he should then have reversed his engines and gone ahead forward, which would have counteracted the drift of the current towards the plant and prevented the collision. But we do not gather from the evidence that the pilot ever succeeded in swinging the head of his tow clear of this plant, and that it was again drawn to it by the current. He nearly succeeded in swinging it clear. As stated, had the repair flat been out of the way, there would have been no collision. But he did not, before the collision, succeed in swinging it entirely clear. Then, if he had so succeeded, that he did not then drive ahead may be attributed to no more than error of judgment. The fact that the other boats got by safely is no evidence of the fact that the pilot of the Sallie Marmet was at fault. The conditions in each instance of safe passage were different in certain particulars from those existing in case of the Sallie Marmet, and they may have been different in other particulars not appearing. At most, this circumstance can go no farther than show an error of judgment on the part of the pilot of the Sallie Marmet. Each of the others made a narrow escape. Whichever way was chosen, it was prudent to get as close to the plant as could be done with safety; for on the one side the rock bar had to be avoided, and on the other the sand bar.

How, then, was it in the matter of discovering the light? Was the pilot at fault in not discovering it sooner? In determining whether

he was at fault in not discovering it sooner, a conclusion must be reached as to how soon he could have discovered it. It is contended that he could have done so above the two islands, by looking down between them. It is not unlikely that he could. But that is entirely too problematical to justify charging him with fault. It is problematical, too, if he could have discovered it then, whether he should have done so. It is further contended that he could have discovered it when about opposite Light No. 2, referred to in the quotation heretofore made from his testimony. This is a government light on the Kentucky shore a little above the middle of the Towhead, and it is about 4,200 feet above where the dredging plant was located. It is likely he could. A straight edge placed on the map shows that he could. But it cannot be said that he could beyond reasonable doubt, or, to use Judge Lurton's phrase, "beyond cavil." None of the boats passing down that evening saw it that far away; and it has not been shown by any appropriate test that he could. A test was made on behalf of the dredging company when the river was 30 feet high at Portsmouth. But nothing is to be gathered from what was so disclosed as to how soon the pilot of the Sallie Marmet could have discovered the light on the night in question. It is not unlikely that the timber on the Towhead and the willows growing on its bank, particularly the latter, prevented his discovering it until he was somewhat below the government light. It does not appear when the pilots on the Leader and the J. T. Hatfield first discovered the light. But it does appear when the pilots on the Florence Marmet did, and the point where they first discovered it was somewhat above where the pilot of the Sallie Marmet did and somewhat below the government light; and a test made with the Sallie Marmet on behalf of the coal mining company, when the stage of water was about the same as it was that night, tends to support the position that where the pilots of the Florence Marmet discovered the light was about the place where it could first have been discovered.

It is not easy to determine how far from the dredging plant this point was. Two maps were introduced by the coal mining company —one made from observation and the other from observation and measurement; and the points where the light was first discovered by the pilot of the Florence Marmet and the pilot of the Sallie Marmet were indicated on the former. The pilot of the Sallie Marmet testified that he first discovered it when he was 200 or 250 yards—i. e., 600 or 750 feet—from the dredging plant. This of course meant when the head of his tow was that distance therefrom. The pilot on the Florence Marmet testified that he first discovered it when they were 1,300 or 1,400 feet from it. It would seem that in both instances a mistake was made. The distance was greater than that estimated. The light on the plant was not far above the surface of the water, possibly not more than 4 or 5 feet. As heretofore noted, the less the height it was above the water, the more difficult it was to estimate the distance. According to the indication on the map the head of the Sallie Marmet was as much at least as 1,300 or 1,400 feet from the light, and the Florence Marmet as much as 500 feet, and probably more, further away. It must be taken, therefore, that the pilot of the

.Sallie Marmet did not discover the light as soon as he could have done. He could have at least discovered it as soon as it was discovered on the Florence Marmet. Possibly he could have discovered it when about opposite the government light; i. e., 4,200 feet away.

Was he at fault, then, in not discovering it sooner, or as soon as he could have done so? In judging his conduct, it is to be borne in mind that he did not know that the dredging plant was so located, and he had no reason to suspect that it was. His partner, who was to take his place at midnight, and who came into the pilot house after he discovered the light, was the pilot on the Leader when she went up on August 28th, and he had, at some time theretofore, exactly when not appearing, told him that the Northern No. 2 was at Manchester digging sand, not saying exactly where. He supposed that it was at the wharfboat, down next to which the sand bar on the Island extended. Had he known that the work was being done at the place of collision, it was not to be contemplated that she would be anchored there after night, when it must have been known that the fleet of towboats was coming down. The pilots on the other boats, except those on the Florence Marmet, seemed to have known that the dredging plant was at work somewhere about Manchester; but it never occurred to any of them that she would be so anchored under those conditions. The reason he gives for not discovering the light sooner was that he was watching the head of his tow. When he reached the Government Light he reversed his engine and continued to back slowly, floating with the stream, until he discovered the light, when he put on all his power in backing. He backed, and watched the head of his tow, in order to make the turn successfully. Until he began to turn, his head was towards the Kentucky shore, and the light was to his right, not ahead of him. He stood on the starboard side of his wheel, and he testified that it is probable that he had the stacks between him and the light. Now it cannot be said beyond cavil that he was at fault in so watching and so standing, when he had no reason to suspect that such an obstruction was in his course. His testimony was that in floating, backing slowly, it was his practice to stand on the starboard side, and that most all of the pilots did so. The only obstruction that he had reason to suspect might be in his way was an ascending boat. It does not follow from the fact that his attention to the head of his tow and the possible obstruction of his stacks prevented his seeing the light—a single light not far above the water, and that on a bright moonlight night—that they would have prevented his seeing another boat ascending the river. Besides the light was in a line between him and the lights of Manchester, and it is not impossible that this prevented his taking notice of the light on the plant sooner than he did. It was proven by the dredging company that, in explaining the collision shortly thereafter, he said that when he first saw the light on the dredgeboat they were right in the line of the light on the wharfboat at Manchester, and it was some little bit before he could make out what it was.

It must be held, therefore, that there should not be any division of damages because of fault on the part of the pilot of the Sallie Marmet. The only other particular in which it is claimed that its

operators were at fault was in the matter of a lookout; and this contention must be held to have been made good. Possibly the fault here should be stated to have been, not in not having a lookout, but in that he was not properly performing his duties as such, at and from the time the presence of the dredging plant could have been discovered by him. There was a lookout. He is called a watchman. His place was on the head of the tow, and his duty was to act as lookout. He was not there at and from such time. He had left his post to call the crew for a change of watches, and had not returned. He was in the act of returning at the moment of the collision. He left a deck hand on the head of the tow, but he was engaged in measuring the water in the barges. The only question here, therefore, can be whether the evidence establishes, with sufficient cogency, that such fault was contributory to the collision. If it does not, notwithstanding such fault, there can be no division.

[5] In The Ariadne, 13 Wall. 475, 478, 20 L. Ed. 542, The Genessee Chief, 12 How. 443, 463, 13 L. Ed. 1058, The Roby (C. C. A. 6), 111 Fed. 601, 612, 49 C. C. A. 481, and Great Lakes Co. v. Pittsburgh Co. (C. C. A. 6), 222 Fed. 862, 866, 138 C. C. A. 288, it seems to have been thought that the absence of a lookout raised a presumption, or justified the inference, that the ensuing collision was caused or contributed to thereby. Whether or not such presumption should be considered as generally arising, it is, at the best, a disputable presumption. The Georg Dumois (C. C. A. 4) 153 Fed. 833, and cases cited on page 835, 83 C. C. A. 15. Since, as we have seen, The City of New York, as applied to the facts here, clearly puts the burden upon the dredge to show that the fault of the steamboat did contribute to the collision, the abstract question seems to present itself whether such presumption of causation arising from the absence of a lookout is sufficient to satisfy this burden of proof, or whether a boat, situated as the dredge was here, must go further, and show the facts and circumstances making the inference so strong as to require adoption. We do not think it necessary to decide this abstract question. If such presumption exists, and is strong enough for this purpose, it is because it is the natural chain of inference that a vigilant lookout will discover the danger, that he will promptly notify the pilot, and that the pilot will promptly steer the boat out of danger. This chain of inference and resulting presumption can be applicable only to the ordinary case where the pilot has freedom of action and where the prompt warning will normally bring entire safety. It cannot reasonably apply, and it should not be applied, to a case where at the earliest moment when the warning could have been given to the pilot the boat is already measurably out of control and in extremis, and where it is merely speculative whether the pilot could have done anything that would have avoided the collision, nor to a case where it is uncertain whether a duly vigilant lookout would have made the discovery substantially earlier than the pilot did make it. The facts of this case bring it clearly within the first, and perhaps within the second, of the classes just stated, as will now be pointed out.

It is quite likely that, if the lookout had been at his post and properly attending to his duties, he would have made such earlier discovery

of the light. But there are considerations which might have affected his discovery. It was not ahead of him, but off to his right. It was a single white light. There was a bright moonlight. It was on the far side of the dredge and near the water; and possibly the lights of Manchester would have confused him to some extent. Then, possibly, reasonably he would not have felt called on to communicate his discovery to the pilot on the ground that the latter had already discovered it. The basis for such a thought is to be found in the circumstance that from the time he could have discovered the light the engines of the towboat were reversed, and she with her tow was under control, floating down the river. And, finally, it is difficult to say with any degree of confidence that if the lookout had been at his post, and had discovered the light and communicated his discovery to the pilot as soon as he could have done so, or at least sooner than the pilot himself discovered it, the latter by the exercise of reasonable care could and would have avoided the collision. Beyond question, if the pilot had become aware of the presence of the dredging plant sooner than he did, he would have had a better opportunity of avoiding the collision than he had when he discovered it himself. As heretofore stated, he did not discover it until he had centered on the dredging plant. To avoid the collision he had to get his tow off the plant as well as to determine which side to take. Had he discovered it sooner, his sole problem would have been to so determine. But it does not follow, necessarily, that because he would have had a better opportunity to avoid a collision, had he become aware of the presence of the light sooner than he did, that by the exercise of reasonable care he could and would have avoided it, if its presence had been communicated to him by a proper lookout properly performing his duties, as soon as he discovered it.

In determining this, note must be taken of the fact that from the time when such a communication could have been made to him he was in extremis. It was not possible for him to stop. He did not have sufficient power to back upstream, or even to hold his tow against the current. There was nothing on the Kentucky shore to tie to. He was compelled to go ahead and confront the extremely dangerous situation ahead of him. The situation was extremely dangerous. It was not certain that he could get by safely on either side. Whichever side he took he was in danger of being drawn by the swift current against the dredging plant. It was important for him to go as close to it as he could possibly do with safety. On the left he had to avoid the rock bar, and on the right the sand bar. Possibly there was less danger in striking the sand bar than the rock bar. But in going that way he had two turns to make. The situation was so dangerous that there is reason to believe that neither the Sallie Marmet, nor the Florence Marmet, nor the J. T. Hatfield would have attempted to make the passage, had they known it before they were where they could not keep from going ahead and confronting the danger. It was calculated to alarm and scare the pilots of each of these towboats, and did alarm and scare each of them. Any error of judgment on the part of the pilot of the Sallie Marmet, in the contingency under con-

'ion, would have been a mere error of the moment, and not a

Can it, then, be confidently said that if there had been a proper lookout, and he had communicated the presence of the light to the pilot as soon as in the proper performance of his duties he discovered it, the pilot by the exercise of reasonable care could and would have avoided the collision? It does not follow that such would have been the case, because the Florence Marmet, which took the left, and the J. T. Hatfield, which took the right, made the passage in safety, the latter with much difficulty. Possibly—not improbably—to avoid the rock bar he may have determined that he should go closer to the dredging plant than did the Florence Marmet, and possibly—not improbably —the Sallie Marmet may not have been as good a twister as the J. T. Hatfield. Whichever way he went, therefore, he may have been drawn onto the dredging plant by the swift current. We think, therefore, that it cannot be said "beyond cavil" that the collision would not have happened by the exercise of reasonable care on the part of the pilot of the Sallie Marmet in the contingency stated; and if for this reason it cannot be said that the absence of a proper lookout was not contributory to the collision, for the same reason, if we should be in error in the position that the pilot was not in fault in himself not discovering the light sooner than he did, it cannot be said that his fault was contributory thereto.

The case, then, comes to this: It is an absolute certainty that the operators of the dredging plant were flagrantly in fault, and that such fault on their part was an efficient and a proximate cause of the collision; whereas, on the other hand, though the operators of the towboat and her tow were in fault in the matter of the lookout, but not flagrantly so, at best it is no more than a matter of speculation, to a more or less extent, that such fault contributed thereto. Such being the case, there should be no division of the damages.

We are therefore constrained to hold that the decree of the lower court should be affirmed on the appeals of the dredging company, and reversed on that of the coal and mining company, with directions to enter a decree in its favor, for the sum of $2,775.93, the damages found to have been sustained by it, with interest thereon from 2d day of March, 1917, and costs.