**THE CHOCTAW. THE WAHCONDAH. GRAND ISLAND S. S. CO. v. CANADA S. S. LINES, Limited.**

(Circuit Court of Appeals, Sixth Circuit. January 14, 1921.)

No. 3405.

1. **Collision ⊜⊃85—Custom not to check speed in fog relevant on issue of due caution.**

In a collision case, proof that it was a steamer's long-continued custom not to check speed merely for fog is relevant on otherwise doubtful issue whether, under the same management, it checked speed on particular occasion, and trial court did not err in investigating such custom on its own motion.

2. **Collision ⊜⊃85—Evidence held not to sustain finding of undue speed in fog.**

In a collision case, proof that a boat customarily did not check speed in fog while operated by its captain *held* not to sustain a finding that speed was not checked on the particular occasion involved, when the boat was in charge of a mate, and the direct testimony of witnesses tended to show that he had properly checked its speed.

3. **Collision ⊜⊃77—Steamer liable when lookout maintained 200 feet aft from bow.**

In a fog collision case, a boat was liable for damages where, instead of maintaining its lookout in the bow, he was posted some 200 feet back,

⊜⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

toward the stern, since the additional distance may have prevented him from properly hearing and locating the signals of the approaching boat.

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Libel by the Grand Island Steamship Company, owner of the steamer Choctaw, against the Canada Steamship Lines, Limited, owner of the steamship Wahcondah. From a decree dividing damages, the libelant appeals. Affirmed.

On July 12, 1915, the steamers Choctaw and Wahcondah were in collision in a fog in Lake Huron, near Presque Isle. The Choctaw was sunk; the Wahcondah considerably, though not vitally, damaged. The owners of the Choctaw libeled the Wahcondah, alleging that she was running at excessive speed in fog. The Wahcondah filed answer and cross-libel, not denying the fault alleged, but claiming that the Choctaw also was at fault for lack of lookout, for excessive speed, and for accepting the Wahcondah's two-blast passing signal when she should have sounded an alarm and reversed. Upon the trial, witnesses for the Choctaw agreed in testifying that she entered a dense fog at 4 a. m., immediately slowed to bare steerageway, and continued at that speed carefully until 4:22, when the collision occurred. They further testified that they heard one fog signal from the Choctaw about three minutes before the collision; that this signal was on the port bow and seemed a long way off; that they had been sounding and continued to sound their own fog whistle at intervals of less than a minute; that they heard no more from the Wahcondah until after about 2½ minutes (as the mate estimates), when there came a two-blast passing signal, which also seemed faint and a considerable distance away; that, although this was not the normal passing, and indicated that the vessels would have to cross each other's bows, they thought there was time enough to do so safely, and at once answered by accepting the two-blast signal, and that almost immediately thereupon the Wahcondah came out of the fog and struck the Choctaw at about a right angle, on the port side, 50 feet from the bow. The Wahcondah offered no testimony, but depended on cross-examination of the Choctaw's witnesses to show the faults alleged in the cross-libel.

The trial judge accepted the testimony of the Choctaw's witnesses, and announced his conclusion that the Wahcondah would be held solely at fault. Before the decree was signed, the Choctaw, at the judge's request, furnished him with its logs, kept separately for each trip, for all trips which the Choctaw had so far made that season, and for each trip made during the entire season of 1914 (from Lake Erie to Marquette and return). Upon inspection of these, the judge became convinced that the Choctaw habitually ran at full speed in fog, and that the case ought to be re-examined in the light of this habit. Accordingly it was reopened for further testimony on both sides. All these logs were put in evidence, practically on motion of the court and against the objection and protest of the Choctaw; and, as counsel for the Choctaw declined to examine its officers with regard to the logs, the judge did so. The captain was so examined at length with reference to what the logs showed on this subject for each one of the trips, and was then further examined by counsel for each party as desired. A similar course was followed as to the mate, with reference to the trips since he had been on board. Witnesses for the Wahcondah gave evidence tending to show that, at the time of the collision, the Choctaw was running full speed. As the result of going over the logs, first by himself and then with the witnesses, the judge announced his conviction that, during the one full year and the additional fractional year covered, the Choctaw was shown to have always run at full speed in fog, unless there was some other reason than the fog for checking—as, because of meeting a steamer, or approaching a harbor, or being in a river—and that the testimony of the witnesses that on this particular occasion they had checked, as stated, was incredible. He thereupon directed a decree dividing damages, and from this decree the Choctaw appeals.

Hermon A. Kelley, of Cleveland, Ohio (Kelley & Cottrell, of Cleveland, Ohio, on the brief), for appellant.

Frederick L. Leckie, of Cleveland, Ohio (Holding, Masten, Duncan & Leckie, of Cleveland, Ohio, on the brief), for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] The contention chiefly urged by the Choctaw is that the trial court had no right to resort to these logs, or to draw from them the inference which he did, or to give to that inference the effect which he gave it, to overturn the direct testimony of the witnesses. We are not prepared to say that there was error in resorting to these logs. It is, of course, to be conceded that, as bearing on the truth of a master's testimony that he had checked in a fog at a particular time, it would be irrelevant to show that he did not check in a certain fog on some certain previous trip, and that a ship cannot be condemned for former reckless speed, if she has been running carefully during the critical period. The Ludvig Holberg, 157 U. S. 61, 15 Sup. Ct. 477, 39 L. Ed. 620). That is quite another question. Whether a boat, when on the open lake and in no apparent danger, should run at full speed in a fog, or should obey the rules by running under check and carefully, admits of no doubt, under the law; but it has a practical aspect, as a matter of economic policy, which is to be determined, in the first instance, by the master, and eventually by the owners.

It is entirely possible, as was stated by the master of the Wahcondah, and as was assumed by the trial judge to be a matter of common knowledge by all familiar with lake traffic, that the masters would be glad to run slowly in fog, were it not that the owner generally expected them to make time, which they could not make if they strictly obeyed the rules. Proof tending to show an established and long-continued custom on the part of a steamer never to check merely for fog, no matter how dense, but to continue at full speed, we think would be distinctly relevant toward determining an otherwise doubtful issue of fact, whether the boat on a particular occasion, while under the same management and the same master, did depart from that custom and for the first time show caution, instead of utter recklessness.

Nor can we say that there was error by the trial court in taking up such an inquest on his own motion. The public danger arising from violation of these navigation rules is so extreme that the court, in the public interest, should be vigilant to visit any violations with due penalty.

[2] However, in the present case, we are compelled to think that the vigilance and earnestness of the trial judge in this respect carried him too far. He assumed that every entry of fog on the log indicated fog of sufficient density so that there should be a check. The captain assumed that no such entry showed a fog thick enough to require checking, unless the engine revolutions showed that he had checked. Very likely neither conclusion is inevitable. For some time before the collision the captain had been below, and as to the speed or checking at that time he was not a witness; the ship was in charge of a mate,

who had been upon the ship only during the previous five trips of this season, and who was sailing only the early part of his second trip as first mate, so as to carry the responsibility of navigating the ship during alternate watches. The effect of the old logs to discredit his testimony could not be convincing, and nothing was shown from the log of the previous trip (his only former one as first mate), save one instance of running without check in a fog when he was apparently in charge. This was in the open lake in Lake Superior. It is denied that the fog was dense enough to require checking, and it seems certain that at least for part of the time it was not, since the entry of fog and the attendant showing of full-speed revolutions cover the time when they were getting out of a harbor, where full speed would have been impossible, unless they could see fairly well.

There is nothing in the record of the ship making it seriously improbable that this mate, just promoted and naturally feeling his responsibility, running into a dense fog bank, should have checked and continued to check for 20 minutes, just as he says he did; nor is the ship's record, in our judgment, sufficient in itself to justify a finding that the several witnesses invented the whole story, including falsification by the acting engineer of his temporary slate record. There was nothing in the appearance or demeanor of the witnesses to discredit them, as the trial judge found upon the first hearing. Their story was confirmed by the conduct of the Wahcondah people, who on that hearing made no proof that the Choctaw maintained undue speed. Such testimony as was given on the second hearing from the Wahcondah, indicating the speed of the Choctaw, is not very forceful, particularly after failure of the same witnesses to testify on the first hearing, although present in court. We conclude, therefore, that the record does not contain sufficient basis for condemning the Choctaw for undue speed.

[3] There remains the matter of lookout. The Choctaw was about 270 feet long on deck, of the whaleback type, and with a standard steamer bow. The deck structure, containing the bridge and upper and lower pilot house, was near the stern, more than 200 feet from the bow. On the deck at the bow was what the witness called a turret, and in smooth weather the lookout might have stood upon this, although in a sea it would be otherwise. After they entered the fog at 4 o'clock, the mate and the wheelsman were in the upper pilot house with the windows open, and the lookout, who was an experienced and competent man, stood on the bridge just outside the lower pilot house.

By way of answer to the complaint that there was no lookout at the proper place on the bow, it is said, first, that in this type of boat it is usual and right to have the lookout where this one was. His absence from the ordinary and proper location at the bow cannot be justified for these reasons. We find no evidence of such custom; nor is the ship's type a sufficient excuse. The sea was smooth, and there would have been no difficulty in standing on the bow turret, and that location, seemingly, would not have been beyond calling distance for making reports. In The Manchioneal (C. C. A. 2) 243 Fed. 801, 156 C. C. A. 313, on a ship 150 feet long, her lookout was standing at the

pilot house because the forecastle head was turtle-backed and was slippery when wet. The court said (243 Fed. 805, 156 C. C. A. 317):

"By the overwhelming weight of authority it is settled that the proper place for a lookout is, under ordinary circumstances, on the bow" (citing cases).

The conditions existing in the present case—a smooth sea and a fog—made it both feasible and especially important that he should be at the conventional station.

By way of further answer as to the lookout's position, it is said that he could see and hear where he was as well or better than at the bow, so that his faulty location could not have made any difference in the result. There is grave doubt whether the absence of a properly posted lookout ought ever to be held inconsequential in a fog case. There is too much inherent uncertainty as to what he might have seen and heard if he had been in the right place.

"The denser the fog and the worse the weather, the greater the cause for vigilance. A ship cannot be heard to say that the lookout was of no use, because the weather was so thick that another ship could not be seen until actually in collision. Marsden on Collisions at Sea (6th Ed.) 472, 474," as quoted in The Sagamore (C. C. A. 1) 247 Fed. 743, 755, 159 C. C. A. 601, 613.

"It was incumbent upon the Columbia [in a fog] to maintain lookouts as far forward and as near the water as possible, and at a height above the water, as well for the purpose of hearing as seeing. * * * No excuse can be found for a failure to have lookouts forward, and there was no reason why they should not have been stationed at the stem, which, besides being so much nearer any approaching object [the lookouts were on the bridge 94 feet from the stem] was about 15 feet closer to the water." Watts v. U. S. (D. C.) 123 Fed. 105, 113. See, also, The Sagamore, supra, and cases cited on pages 754, 755, and The Tillicum (D. C.) 217 Fed. 976, 978.

We do not find that this court has ever held the lack of a bow lookout in a fog collision to be immaterial, because not a contributing cause; but if the rule of liability, as an invariable one, may be too harsh, and if it may be applied in fog cases with as much flexibility as in others, it at least must be made to appear with reasonable certainty that there is no room for any inference of contributing effect. The Roby (C. C. A. 6) 111 Fed. 601, 612, 49 C. C. A. 481; Great Lakes Co. v. Pittsburgh Co. (C. C. A. 6) 222 Fed. 862, 866, 138 C. C. A. 288; Marmet Co. v. Feiger Co. (C. C. A. 6) 259 Fed. 435, 447, 170 C. C. A. 411.

Although it may be true in individual cases, there can be no presumption that a lookout 200 feet back from the bow and higher up can see as well; sometimes he could, and sometimes he could not; but in this case we must agree with the District Court that a lookout at the bow would not have seen anything enough earlier to have made any difference whatever in the result. No one could see further than a boat's length, if so much as that.

A different question arises as to hearing. The lookout should be not only the eyes, but the ears of the ship. This group of three men, close together on the deck structure, might naturally talk together, and the lookout's attention be diverted. The fog whistle blowing three-blast signals at intervals of less than a minute, and therefore blowing

a considerable share of the time, was within a few feet of them, and their ears would resound with the noise for a time after each blast. They were close to the smokestack, and would often get the roaring of the draft and of escaping steam. The ventilators, extending down to the engine room, came up just back of them, and the ventilator mouths were turned forward toward them, so that the shoveling of coal and the noise of the machinery could be heard. It was the noisiest spot on the boat, outside of the engine and boiler rooms. If the look-out had been at the bow, his attention would have been centered wholly upon listening. He would have had no distracting companions, nor confusing noises, except for the effect of the whistle, and that would have been lessened. It is quite clear that a lookout at the bow would be likely to hear whistles and signals from approaching boats which might escape the same man if at the pilot house.

In addition, and in a fog, there would be further advantage in this position. He might hear a signal from the true direction, while 200 feet away, a false impression of direction would be given because of the peculiarities of the fog. In any event, it might be helpful to have two different bearings upon the approaching signal; but we would be reluctant to rest upon these features a conclusion of fact that his absence from the bow might have contributed, because there is no satisfactory evidence [1] that the Wahcondah blew any signals that were not heard, and there was no mistake as to her bearing. We are better satisfied to point out a reasonable theory under which we can see that there would have been a fair probability of escape from collision if the lookout had been rightly stationed, rather than to let the case stand on the mere presumption that his presence might have done good.

Accepting the statements of the Choctaw and the Wahcondah as to their respective speeds, and the Choctaw's testimony that the first fog whistle heard was three minutes before the collision, it follows that the boats were then about 3,600 feet apart. The Choctaw witnesses say they all estimated the distance as more than a mile. A lookout at the bow might well have judged the distance accurately; it is familiar knowledge that there may be no uniformity in the obstruction to sound here and there in a fog. They all appreciated that the whistle was from a boat coming toward them. There is no claim that it could have been anything else. It was the duty of this approaching vessel to blow fog whistles once a minute, but for 2½ minutes nothing was heard. An approaching boat would be expected only from Mackinac or Detour. If the former, it would be on a converging course, and the danger would speedily become imminent; if the latter, the courses would be parallel, and the danger only less probable. On whichever course, the approaching boat was not obeying the law. It would seem that the mate might well have taken alarm, even though thinking that the fog signal they heard had come from a mile away.

If this boat was not blowing the required signals, what inference

---

[1] On this second hearing, the Wahcondah's captain says he blew two successive two-blast signals; but, in view of his silence on the first hearing, this testimony should be received cautiously.

could there be that she was obeying the law as to speed? If she was running full speed, the two boats would approach each other half a mile in two minutes; but, whatever the measure of prudence appropriate when based on the mistaken idea of "a mile or a mile and a half," it seems certain that, if they had rightly judged the distance at first, and then the time continued passing without any further fog signal, they would all have appreciated that this approaching and unlawfully silent boat might be getting too close, and they would very likely have done what we now see would have been the right thing, viz. to stop and blow an alarm, in effect calling out, "Where are you, and why don't you blow?" If the lookout had been forward, he might not have truly interpreted the fog signal and understood its closeness soon enough to change the result; but, on the other hand, he might have done so, and it is quite within the reasonable probabilities that the collision would not have occurred.

We have, thus far, accepted the estimate of the Choctaw's mate as to time and distance. She can hardly complain if the wheelsman's testimony is considered. He heard the Wahcondah's fog whistle about three minutes before the collision, and heard a two-blast passing signal immediately thereafter. He says the two were as close together as they could be without danger of being misunderstood, as intended for an alarm. If this is true, then so much the greater would have been the probability that a lookout at the bow would have placed these signals at their true distance, instead of thinking that they were twice as far away. In that event, there would have been sufficient time for an alarm and a stop to have avoided the collision.

After we assume that the Choctaw is chargeable with that knowledge of the truth which it might not improbably have obtained through the ears of a bow lookout, we have a case substantially within rule 26, as interpreted and applied by this court in The Roby, supra. Rule 26 (U. S. C. S. § 7936; the White Law, Act Feb. 8, 1895) provides that:

" * * * In every case where the pilot of one steamer fails to understand the course or intention of an approaching steamer, whether from signals being given or answered erroneously, or from other causes * * * the pilot so in doubt, shall sound several short and rapid blasts of the whistle; and if the vessels shall have approached within half a mile of each other both shall reduce their speed to barely steerage way, and, if necessary, stop and reverse."

In The Roby, supra, 111 Fed. 609, 49 C. C. A. 489, we thought that this rule, in connection with rule 15 (Comp. St. § 7925), applied imperatively to vessels which had approached within half a mile of each other without having reached a satisfactory passing agreement. Applying that rule here, we find that the vessels had, in fact, approached within half a mile of each other (on the mate's testimony) without any passing agreement; that the pilot of the Choctaw was, or should have been, in doubt as to the course or intention of the approaching boat, and was required by the rule to blow an alarm; that the only excuse for not doing so is that they misjudged the signal, and did not think the approaching steamer was so near; and that, with a lookout prop-

·erly posted, there is fair probability that they might have avoided this mistake. See, also, Pittsburgh Co. v. Duluth Co. (C. C. A. 6) 222 Fed. 834, 835, 138 C. C. A. 260.

This view leads to the conclusion that the Choctaw should be condemned for the lack of lookout, and that the damages should be divided.

For this reason, the decree will be affirmed.