## THE ETRURIA.

(Circuit Court of Appeals, Second Circuit. May 22, 1906.)

No. 253.

COLLISION—STEAMSHIP AND DRIFTING LIGHTER—MUTUAL FAULT.

A towing tug which cast adrift two lighters, having neither motive power nor means of signaling, near the middle of the Hudson river opposite New York City, on a somewhat foggy day, while delivering a third boat, *held*, in fault for a collision between one of such lighters and a steamship passing out to sea which did not make out the lighters until within less than 1000 feet of them, and the steamship also *held* chargeable with contributory fault, either in failing to sooner see the lighters or, in case excusable in that because of the thickness of the fog, in going at such rate of speed that she was unable to avoid them after they were seen.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, §§ 79, 152, 170, 175.]

Appeal from the District Court of the United States for the Southern District of New York.

For opinion below, see .139 Fed. 925.

Albert A. Wray, for appellant.

W. Mynderse, for appellee.

Before WALLACE, TOWNSEND, and COXE, Circuit Judges.

WALLACE, Circuit Judge. This action was brought by the owner of the barge Oval Brand to recover damages for the collision between the barge and the steamship Etruria. The court below dismissed the libel.

We accept, as substantially correct, the findings of fact stated in the opinion of the District Judge, differing with him in some of the details only; and we agree with his conclusions of law that the owner of the Oval Brand was in fault, for the. reasons stated in his opinion. We think, however, that the Etruria was also in fault.

The Oval Brand, a lighter without motive power of her own, was lying alongside another lighter near the middle of the Hudson river, opposite, but somewhat below, pier No. 25, on the morning of a somewhat foggy day, when she was struck by the Etruria. Both lighters were practically motionless, drifting upon a slack ebb tide, and heading somewhat toward the New York shore. They had been left drifting temporarily by their owner's tug, and were not provided with a horn or other means for making any fog-signals.

The Etruria, with her master, pilot, and second and third officers on her bridge, and two lookouts forward, had left her pier, which is about a mile and a half above the place of the collision, and, having straightened on her course down the river, was proceeding about mid-channel when she observed about 1,500 feet away a car-float, loaded with railroad cars and attached to a tug, proceeding slowly from the New York side on a course across the river towards the New Jersey side, apparently intending to cross the path of the steamship. Thereafter the Etruria maintained her course and

speed for some little distance, and then altered her course to starboard, her wheel being put hard to port, thereby throwing her bow toward the Jersey shore, and she passed in front of the car float some 70 or 80 feet away. The Etruria then began to alter her course to port, to regain her original course in mid-channel—her wheel being put hard starboard, according to the testimony of her quartermaster who was at the wheel—when her pilot and some of her officers discovered the lighters bearing about a point upon the Etruria's port bow. The lighters were then about 750 to 1,000 feet away. Immediately upon discovering the lighters the Etruria attempted to regain her course again to starboard, her wheel being put hard to port; but, finding she could not do so sufficiently to avoid the lighters, she reversed her engines, and, although her headway was retarded, the bluff of her bow struck the lighters near the stern of the outlying lighter with considerable violence, and she ran some little distance after the blow.

It is apparent from these facts that the Etruria must have maintained her original course until she was quite near to the car float, otherwise her wheel would not have been put hard aport to pass in front of the car float. It is apparent also that for some interval of time before she passed the car float, the latter, loaded with cars, intercepted to some extent her view of the lighters.

One of the controlling questions of fact is whether the Etruria should have discovered the lighters, either before she first changed her course to starboard, or, if not earlier, before she again altered her course to port. After the last maneuver it would seem that it was impracticable for her to regain her course to starboard in time to avoid collision with the lighters, and it was imperative for her to reverse full speed astern. Another question of fact is whether she was maintaining too high a rate of speed in view of the state of the fog. Her own theory is that the fog was heavy, and that her speed was at a rate of not more than about four miles an hour. According to her answer the weather was "thick and foggy." After the original entry of the collision was made her log was interlined to show that it was foggy at that time. The absence of such an entry originally is a suspicious circumstance.

A careful consideration of the evidence satisfies us that the Etruria has sought to exaggerate the density of the fog, and has convinced us that although at times during the morning it was thicker than at others, at the time of the collision it was not so thick that the Etruria could not have discovered the lighters when more than 1,500 feet away. Indeed, it is stated in the pleadings by the Etruria, and by some of the witnesses, that she did discover them when 1,500 feet away. As has been said, she did not discover them until she was within less than 1,000 feet of them. The pilot of the Etruria testifies that he had no report from the lookouts; and neither the lookouts, nor the master, the second officer or the third officer, all of whom were on the bridge with the pilot, were examined as witnesses. We think that the lookouts and those who were upon the bridge had their attention somewhat diverted by watching the operations of

the tug attached to the car float before she crossed the path of the Etruria, and watching the car float afterwards and when to some extent she intercepted the view of the lighters. If a vigilant outlook had been maintained, it seems impossible to doubt that the presence of the lighters could have been discovered, certainly before the Etruria altered her course to port while passing the car float; and if the lighters had been observed, that change towards port would not have been made, and the Etruria would have safely passed the lighters port to port.

If, owing to the state of the fog, the lighters could not have been discovered by vigilant observation until the Etruria was within 750 or 1,000 feet of them, it is plain that the Etruria was maintaining too great speed. The fact that in making the changes of course her wheel was put hard over, suggests that she was going at a higher speed than she asserts. However that fact may have been, her speed was excessive if it was true that she could not reverse her engines and come to a standstill before she should collide with a vessel which she ought to have seen. The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, 34 L. Ed. 687.

The fact that the lighters were lying stationary and without motive power to help themselves in the crowded channel, did not under the circumstances embarrass the Etruria, and is of no importance in absolving her from the consequences of her contributory fault. If they had been under motion the Etruria would have had to ascertain the direction in which they were moving, and to some extent their speed, in order to avoid them; and it is not improbable that she would have had a more difficult task than she actually did have. If they had been under motion they might perhaps have been better able to keep out of the way of the Etruria; and if they had been provided with means for signaling their presence, they might have attracted her notice before she saw them. These considerations do not excuse the Etruria for colliding with the lighters, if it was practicable for her, using due diligence, to avoid doing so.

The decree is reversed, with costs of this appeal, and with instructions to the court below to render a decree dividing the damages.