## THE EDWARD G. MURRAY. THE McCALDIN BROS. NAVIGAZIONE GENERALE ITALIANA v. TIMMINS.

(Circuit Court of Appeals, Second Circuit. January 18, 1922.)

No. 80.

1. Towage ⟷11(2)—Tug under control of master liable for tort though under general direction of another.

Where several tugs were under the direction of one person employed to move a steamer from one point to another, but each in performing the duty assigned her was exclusively under the control of her own master and acted independently in doing her part of the work, liability in rem must be first ascertained by inquiring what if any marine tort any tug committed.

2. Towage ⟷11(2)—Tug held at fault.

A tug which took a line over the stern of a steamer being moved from dry dock to a pier out of a narrow basin, instead of hanging on behind to help steer her out of the gap, was liable for damage to the ship in a resulting collision, though acting in strict obedience to the orders of one in control of several tugs engaged in the removal; the master of the tug not being justified in blind acquiescence in anything so plainly wrong.

3. Towage ⟷4—Mere act of agreeing to remove steamer did not create conventional maritime lien.

Mere agreement of tug owner to move a steamer from one place to another did not create a conventional maritime lien for nonperformance or malperformance in respect of the tugs furnished, though any towing or helper tug might be obliged to respond for its own wrongdoing.

4. Towage ⟷11(2)—Tug owner agreeing to move steamer responsible for negligence of agent.

A tug owner, who undertook to move a steamer from a slip to a pier and sent an employee to do the job, was responsible as principal for such employee's negligence in controlling several tugs called upon to move the steamer, even though the employee held a license as master and pilot, and though he demanded and received $5 for his services; such payment being a mere gratuity.

5. Towage ⟷15(2)—Recourse to be had to experts for estimates as to damages.

In assessing damages for injuries to a hull rendering it necessary to remove refrigerating apparatus, expert testimony was necessary to estimate the expense in respect of the refrigerating apparatus, the removing and replacing of which was done without any record of actual days' work, and libelant never having paid any bill therefor.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Navigazione Generale Italiana against Edward M. Timmins, with the steamtug Edward G. Murray, the Edward G. Murray Lighterage & Transportation Company, claimant, impleaded, and others. From an adverse decree the claimant of the Murray appeals. Modified and affirmed.

Libelant sues as owner of steamship Procida. On February 8, 1916, that steamer, without cargo, and without steam in her boilers, lay at a pier in the Erie Basin, Brooklyn. She had been repaired at the Robins Drydock and equipped with a refrigerating apparatus for the transportation of fresh meat, and was ready to be shifted to her loading berth at Thirty-Fourth street, North River, although her new refrigeration plant had not yet been tested and some work remained undone that could not be performed until test was made. It was the expectation of the contractors that with some allowance

⟷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

for unforeseen contingencies all work would be completed and the vessel ready to load on February 16th.

Respondent Timmins is the owner of several tugboats, was engaged in harbor transportation generally, and known as one furnishing tugs for the conveyance from one wharf to another of vessels temporarily without motive power of their own, as was the Procida.

The testimony is uncontradicted that Timmins was employed to move libelant's steamer in the following manner: Libelant's superintendent called Timmins' office on the telephone and said, in substance, "Arrange to have tugboats remove (Procida) from Erie Basin to the north side of our pier, Pier 74, North River." The Timmins concern accepted the order and telephoned to the master of their tug "John J. Timmins," then at the Bush Stores, and gave him orders (as testified by the master himself) "to transport (Procida) from Erie Basin to Thirty-Fourth street, North River." This employee, Capt. Keene, did not "receive any instructions with reference to how (he was) to do the work. * * * That was left to (his) own judgment." Capt. Keene summoned the tugs Edward Murray and McCaldin Bros., to assist him on this job; they did not belong to Mr. Timmins and were obviously selected (as is customary) because they happened to be in the neighborhood.

For a vessel of Procida's size the waters of Erie Basin are very narrow. The slip in which she lay was on the side opposite to the gap or entrance of the basin, and it was necessary to haul her out of the slip stern first, swinging her in such manner as to head for the gap, and then go ahead.

Capt. Keene went on the steamer's bridge and took charge of the whole enterprise. In his own language he "gave instructions to the tugs as to what they should do." He admittedly told McCaldin Bros. to "take a hawser off the port bow and go ahead," i. e., go ahead when it was time so to do. His own tug, the J. J. Timmins, he placed on the starboard quarter, and there is no doubt that he ordered the Murray to begin the operation in the only way it could begin, by hauling the Procida out of the slip stern first; and this the Murray did. The only conflict of evidence is as to the orders given by Capt. Keene concerning the Murray's duties after the Procida was out of the slip and in the basin. Keene declared that when the steamer was in the middle of the basin the Murray was to "hang on behind and help steer her out of the gap." The master of the Murray declared that the orders covering his whole duty were, "You take a line over her stern and pull her out and when you get her out come alongside on the port side." It is admitted that when Murray had pulled the steamer out of the slip she did come up on the Procida's port quarter and there make fast. It is proven overwhelmingly, if not admitted, that the only proper way to get such a vessel out of the basin in her then helpless condition was to have a tug hang on behind and act as a sort of rudder.

Under the impetus given to Procida by pulling her out of the slip she nearly crossed the basin, and when McCaldin Bros. started ahead, struck a vessel moored on the basin's opposite side, and received injuries, to recover for which this suit was brought. The Murray on the port quarter was in no position to render assistance and had just time to back out of the way in order to avoid injury to herself.

Capt. Keene held a license from the United States inspector as master and pilot; he guided the Procida in the sense not only of giving orders to her only motive power, the tugs, but of selecting their courses in going to destination in the North River. He personally rendered a bill to the steamship agents for $5—a charge separate and distinct from that made by Mr. Timmins for the transportation work.

The lower court exonerated the tug McCaldin Bros. from all fault; held that the proximate cause of damage was that the Murray was not hanging on the stern as she ought to have been, and was therefore at fault, and that Capt. Keene "had ample time and space" to see to it that the Murray assumed her proper position. Also, held that Keene was Timmins' agent in the premises—wherefore Timmins was liable. From a decree holding both Mr. Timmins and the steamtug Murray at fault and exonerating McCaldin Bros., the claimant of the Murray only appealed.

Foley & Martin, of New York City (William J. Martin and Geo. V. McCloskey, both of New York City, of counsel), for appellant.

Harrington, Bigham & Echglar, of New York City (T. Catesby Jones and Vine H. Smith, both of New York City, of counsel), for the McCaldin Bros.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and Charles E. Wythe, both of New York City, of counsel), for Edward M. Timmins.

Loomis, Barrett & Jones, of New York City (Homer L. Loomis, of New York City, of counsel), for libelant.

Before HOUGH and MAYER, Circuit Judges, and AUGUSTUS N. HAND, District Judge.

HOUGH, Circuit Judge (after stating the facts as above). [1] Although all the tugs engaged were under the general direction of Capt. Keene, yet each in performing the duty assigned her was exclusively under the control of her own master, and acted independently in doing her part of the work. It follows, under The W. G. Mason, 142 Fed. 913, 74 C. C. A. 83, and The Anthracite, 168 Fed. 693, 94 C. C. A. 179, that liability in rem must first be ascertained by inquiring what if any marine tort any tug committed.

[2] None has been alleged against the John J. Timmins, and we agree with the court below that the McCaldin Bros., was without fault, and that the Edward G. Murray was guilty, in that she failed to keep the stern of Procida under control, and permitted that steamer to get into collision. The collision occurred because the Murray took a wrong position; on the port quarter she was useless. It makes no difference, so far as her own liability is concerned, whether the faulty conduct was in strict obedience to Keene's orders or not. The Murray's interpretation (as testified to) of Keene's command involved obedience to orders so opposed to a reasonable skill in towboat work, that no competent tugmaster was justified in blind and silent acquiescence in anything so plainly wrong.

The matter is one of degree; doubtless the Murray's master would have been justified in doing what Keene told him to do, if it were merely a matter of judgment in detail; but to leave the helpless steamer without a stern tug in the narrow waters of Erie Basin was navigation so obviously bad that unnecessary obedience to orders therefor was lack of reasonable skill in towboat craft.

But further, the Murray was not justified in interpreting even what her master declared Keene said, as meaning that the tug was to go on the port quarter as soon as the steamer cleared the slip; reasonable skill required the words to mean that the Murray should get on the quarter when the Procida was "out," not of the slip, but of the basin. The necessity for the Murray's being where she was not was so obvious, and Keene's order as testified to from the Murray so very wrong, that we find as matter of fact that the tug did receive directions as claimed by Keene; a finding of fact which, for another reason, fixes responsibility on the Murray.

278 F.—57

[3] Timmins' liability, as asserted, permits no application of the doctrine of marine torts; nor did he by the mere act of agreeing to move the Procida create a conventional maritime lien for nonperformance or malperformance in respect of the tugs furnished. The Sarnia (C. C. A.) 261 Fed. 900. This does not mean that any towing or helper tug might not be obliged to respond; but the proximate reason for such response would be its own wrongdoing, and not an owner's contract. This is no more than the familiar doctrine of tower's liability, which always depends upon that lack of care under the circumstances, which is negligence.

[4] In this action in personam as against Timmins, his liability is to be determined upon principles of agency. He undertook to move the Procida; not only to furnish the motive power, but, as is plain from the evidence, to furnish the brains in control. He further undertook to do the job by Capt. Keene as his agent and servant. It follows upon legal principles as applicable in admiralty as elsewhere, that he is responsible as principal for Keene's negligence, if any; and we agree with the court below—assuming (as we have now held) that Keene gave proper orders to the Murray, that he had ample time and space wherein to correct the Murray's misconduct, and to make her hang on to the Procida's stern as he had told her to do.

This part of Mr. Timmins' contract, i. e., the agreement to supervise the job, is a separate and distinct thing, although included in what the parties would doubtless call a "towing contract"; for not only did Mr. Timmins by the engagement to "transport" the steamer promise to furnish several tugs, but he also promised to furnish some one who would tell all the tugs what to do.

From this result Mr. Timmins seeks escape by insisting that Capt. Keene, while on the steamer's bridge, was an independent pilot in charge; the corollary being that for the acts and omissions of such pilot no one is responsible but the pilot himself.

Undoubtedly Keene is a pilot, his license gives him the title; as plainly he was not the compulsory pilot of The China, 7 Wall. 53, 19 L. Ed. 67. He was a voluntary pilot, for whose acts or omissions doubtless the ship guided by him is responsible to third parties. Homer Ramsdell, etc., v. Compagnie Generale, 182 U. S. 406, at 416, 21 Sup. Ct. 831, 45 L. Ed. 1155. If Keene were a pilot voluntarily furnished by Mr. Timmins and without compulsion accepted by the Procida, so that Keene piloted as Timmins' agent, plainly the latter is responsible (cf. The Manchioneal, 243 Fed. 801, at 806, 156 C. C. A. 313).

The contention that Capt. Keene was an independent pilot seems to us wholly based upon inferences from the fact that he demanded and received $5 for his services. The evidence is quite sufficient for us to recognize the well-known custom of tugmasters in this harbor obtaining, or at least requesting a similar recompense, when transporting vessels from one harbor berth to another.

The crucial inquiry is whether men like Capt. Keene get the $5 because they are licensed pilots or because they are in command of the leading tug engaged in the transportation. The answer is plain: they are only paid because they are furnished by the employing tug

owner with whom contract has been made, and what they get is a mere gratuity. To test this: Would Capt. Keene have been justified, when performing Timmins' contract, in staying on board his own tug off on the Procida's starboard quarter, and saying to the steamship master, "You can start now, Mr. Timmins is furnishing nothing but the power"? The question answers itself; Keene expected to do the job and all of it, as part of his duty to Timmins, and the latter with good right expected Keene to act as he did.

The decree is affirmed as to the distribution of liability.

The appellant herein further complained of the assessment of damages, and this portion of the appeal was heard before HOUGH, Circuit Judge, and AUGUSTUS N. HAND, District Judge.

Chauncey I. Clark and George V. A. McCloskey, both of New York City, for the exceptions.

Homer L. Loomis, of New York City, opposed.

HOUGH, Circuit Judge. No doubtful question of law is raised by any exception to the commissioner's report, which was substantially confirmed by the District Judge.

There are three contested items: (1) The cost of repairs; (2) demurrage, i. e., loss of use of the Procida; (3) allowance of interest.

The Procida's hull was injured only in respect of certain plating. The cost of repairing these plates is not disputed, but in order to get at the injured portion of the hull it was necessary to remove, and subsequently replace, and test some of the newly installed refrigerating apparatus. This item is in dispute.

This whole plant was evidently something of an experiment, and the work of removing and replacing so much of it as was necessary to repair the steamer's hull was done without any record of actual days' work. We find that the only method of stating the expense to which libelant was put in respect of this refrigerating plant is by expert evidence, and down to date of commissioner's report libelant never paid any bill in the premises.

[5] Under such circumstances, recourse must be had to expert estimates. The Mason, 249 Fed. 718, at 721, 161 C. C. A. 628. In our opinion the estimate given on behalf of claimants is obviously the best, and this item is accordingly reduced to $1,800.

The rate per day for detaining the Procida is agreed upon. The only question is as to the number of days she was actually and necessarily detained by reason of the collision. This is a very doubtful matter, for the libelant has the advantage of having actually remained in port the number of days allowed, when, from all the testimony, it was more profitable to go to sea. We are not able to say that the matter is so clear as to warrant disturbance of the commissioner's findings, and the exceptions are overruled as to the amount of demurrage awarded.

As to interest, we think exceptants and appellant have shown good cause for refusing a full allowance. It is substantially admitted that there was great delay in the assessment; more than three years and a half intervened between interlocutory and final decrees, and for such

delay as this we find no excuse in the record. We have not overlooked the excuses suggested in argument by libelant, but do not find them borne out by the testimony. In drawing the final decree to be entered on the mandate herein, libelant will be awarded interest only from the date of the commissioner's report, to wit, July 20, 1920.

The cause will be remanded to the District Court, with directions to modify the final decree as herein indicated, and, as modified, said decree is affirmed. Appellants will recover the costs of this court as against libelant. No other costs.