### NEW YORK & CUBA MAIL S. S. CO. v. UNITED STATES. THE CONNER.

### THE ESPERANZA.

#### (District Court, S. D. New York. July 21, 1924.)

1. **Collision** ⊚⟞82(1)—**International Rules govern navigation of war vessels in time of war.**

   Article 16 of International Rules (Comp. St. § 7854), requiring moderate speed in a fog and careful regard to existing circumstances and conditions, govern the navigation of war vessels in time of war.

2. **Collision** ⊚⟞82(1)—**"Moderate speed" in fog.**

   "Moderate speed," required in a fog, means speed so slow that the vessel can be stopped within the distance at which another vessel can be seen, having regard to the fog density.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Moderate Speed.]

3. **Collision** ⊚⟞82(1)—**Held due to excessive speed of one vessel in fog.**

   A collision at sea, at night, in a dense fog, between the destroyer Conner and the steamship Esperanza, *held* due solely to the fault of the Conner in proceeding at the excessive speed of 12 knots, and in failing to stop, or even to reduce speed, when the commander heard what he thought might be a fog signal somewhere ahead. Failure of the Esperanza, which was moving at a speed barely sufficient to give steerageway, to stop entirely on hearing the fog signal of the Conner, *held* not a contributing fault.

In Admiralty. Suit for collision by the New York & Cuba Mail Steamship Company, as owner of the steamship Esperanza, against the United States, as owner of the torpedo boat destroyer Conner, with cross-libel against the Esperanza. Cross-libel dismissed, and decree for libelant.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark, of New York City, of counsel), for libelant.

William Hayward, U. S. Atty., and R. B. Romaine, Asst. U. S. Atty., both of New York City.

WINSLOW, District Judge. These are cross-suits in admiralty—one brought by the New York & Cuba Mail Steamship Company,

owner of steamship Esperanza, against the United States, owner of the torpedo boat destroyer Conner, and by the United States against the steamship Esperanza, to recover damages arising from a collision between the Esperanza and the Conner on February 15, 1918, off Barnegat.

The original suit was begun by a libel filed by the Esperanza on April 17, 1923. The cross-libel by the United States was filed July 25, 1923. The suit was not sooner brought because of lack of jurisdiction in the court; the Conner being a public vessel at the time of the collision and continuing as such. By act of Congress approved February 28, 1923, jurisdiction was conferred upon this court to hear and determine the suit and to enter a judgment or decree "upon the same principles and measures of liability as in like cases in admiralty between private parties." 67th Congress, Private Act No. 192.

The facts material to the determination of the issues, not disputed, are as follows:

The Esperanza, with passengers and cargo, left Brooklyn at 3:05 p. m., February 14, 1918, bound for Cuban and Mexican ports. At 7:55 she passed Scotland Light, her course being S. by W. ½ W. This course was maintained until off Sea Girt, when it was changed to S. by W. ¼ W., and later was changed to S. by W. At 10:35 p. m., the weather having thickened, the engines were put half speed and fog signals were sounded at regular intervals. At 10:30 fog shut in and speed was reduced to slow. About 10:49 the speed was reduced to dead slow, three to four knots, "just steerage way." The Esperanza's fog whistles, in the meantime were blown at regular intervals. At 12:08 a. m., February 15th, ship's time, while running at dead slow on a course S. by W., the fog signal of another vessel was heard about three points on the starboard bow of Esperanza. The master and second officer were on the bridge and a lookout stationed on the forecastle head. The fog signal was heard and reported by the lookout, whereupon the Esperanza blew a regular blast on her fog whistle. The captain then took the whistle cord and blew three fog whistles at approximately three-quarter minute intervals. No whistle was heard from the Conner during this time. Then a loud whistle was heard from the Conner, and at the same time she broke out of the fog, apparently coming at high speed, and almost immediately struck the Esperanza a glancing blow on her starboard side, thence disappearing in the fog under the Esperanza's stern. An inspection disclosed that the Esperanza was able to make port without assistance, and she put about, heading toward New York, where she arrived February 15th, at 12:32 p. m.

The Conner, a new torpedo boat destroyer, left Philadelphia February 14, 1918, for Newport, R. I., under orders to make test runs of 12, 16, and 20 knots, using the cruising combination of her turbines. Ten minutes prior to the termination of the 12-knot test, at 9:30 p. m. February 14th, a dense fog shut in, which continued until the collision. The 12-knot test was terminated at 9:40 p. m., when the engines were shifted to high pressure combination, but no change was made in the Conner's speed at 12 knots. The Conner passed Five Fathom Bank Lightship at 7:20 p. m. about 100 yards on her port beam. From there

her course was made at 34° true. Her course and speed of 12 knots were held until the collision occurred. The Conner's commander testified that at 12:12 a. m. February 15th—

"I heard a sound. * * * This sound attracted my attention on the ground that it might be a fog signal. I inquired, and found no one else on the bridge had heard anything which sounded like a fog signal. I gave immediate orders to exercise unusual diligence in listening and to sound our own signal, so that, if this sound had been a fog signal, we would have given an immediate response to the other vessel. Our signal had just been sounded when, through the fog, came a loud, piercing fog signal of a steam vessel under way on our port bow. I immediately called out 'Stop the engines,' and, being the nearest person to the engine room telegraph shoved them myself to the top position and got the stop signal back from the engine room."

The commander further says that—

"The only thing which was seen at first was a string of white lights; nothing to indicate the heading of a vessel of her character."

He thereupon ordered "hard right" to the steersman, and—

"just after that a green light appeared close under the bow, and the Conner struck a glancing blow against some large vessel."

It may be noticed that the Conner's engines were ordered stopped and her helm put "hard right" before either of the Esperanza's side lights came into view. The engines were not reversed, nor her headway checked, and she continued on, striking the Esperanza on the starboard side, glancing off and passing under the Esperanza's stern and disappearing in the fog.

The litigants do not agree as to the place of the collision. The commander of the Conner fixes it at about 12 miles from Barnegat Buoy. The Esperanza fixes it at 3 miles southeast of Barnegat Buoy.

Owing to the fact that no suit could be brought, due to lack of the court's jurisdiction, until after the act of Congress some five years after the collision, the depositions could not be taken earlier. Owing to the lapse of time, only two depositions of Esperanza's witnesses were produced—that of the master of the Esperanza and of the second officer, both of whom were in extremely feeble health. There was also received in evidence, however, the record of the proceedings of the investigation on board U. S. S. Arkansas, February 16, 1918, made pursuant to order of the commander of the Battleship Force 2, U. S. Atlantic Fleet. There is also in evidence the record of the investigation held by the Steamboat Inspection Service at the office of the local inspectors in New York on February 28, 1918.

[1] In determining the question of responsibility, the conduct of each vessel will be considered separately. The International Rules adopted for the purpose of preventing collisions provide that the regulations to that end "shall be followed by all public and private vessels of the United States upon the high seas."

"Art. 16. Every vessel shall, in a fog, mist, falling snow, or heavy rain storms, go at a moderate speed, having careful regard for the existing circumstances and conditions." Comp. St. § 7854.

That these rules govern the navigation of a war vessel in time of war has been distinctly held by this court. Watts v. U. S. (D. C.) 123 Fed.

105. This case arose out of a collision between the U. S. S. Columbia and the Foscolia during the Spanish-American War. It was contended that the Columbia was proceeding at an immoderate speed in fog; the speed, however, being 6 knots. The government contended that the failure of a war vessel to obey the navigation rules during war time was excusable. The court refused to agree with this contention. In the act which authorized the present suit it is provided, among other things, that the issues shall be determined "upon the same principles and measures of liability as in like cases in admiralty between private parties."

The Conner was under a duty to observe the rule as to moderate speed in like manner as a privately operated ship in the admittedly dense fog. In a recent case, in which Judge Ward wrote the opinion, not yet reported (N. Y. & Porto Rico S. S. Co. v. Director General, June 3, 1924), the definition of a dense fog is given as the obscuration of objects 1,000 feet away or less.

Some evidence in the instant case is that the fog was so thick that the lookout on the Conner's bow could not be seen from her bridge 50 feet away. Commander Howe, a most excellent witness, described the visibility as "between 50 and 100 yards."

[2] What is a moderate speed is, of course, a relative term, but it has been the subject of frequent comment and determination. The Colorado, 91 U. S. 692, 702, 23 L. Ed. 379; The Nacoochee; 137 U. S. 330, 339, 11 Sup. Ct. 122, 34 L. Ed. 687. Mr. Justice Brown, in The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053, stated the rule as follows:

"The general consensus of opinion in this country is to the effect that a steamer is bound to use only such precautions as will enable her to stop in time to avoid a collision, after the approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law."

And again, in The Chattahoochee, 173 U. S. 540, 19 Sup. Ct. 491, 43 L. Ed. 801, Mr. Justice Brown again referred to the rule, using the following language:

"No absolute rule can be extracted from these cases. So much depends upon the density of fog, and the chance of meeting other vessels in the neighborhood, that it is impossible to say what ought to be considered moderate speed under all circumstances. It has been said by this court, in respect to steamers, that they are bound to reduce their speed to such a rate as will enable them to stop in time to avoid a collision after an approaching vessel comes in sight, provided such approaching vessel is herself going at the moderate speed required by law." Page 548 (19 Sup. Ct. 494).

[3] Ordinarily it would hardly be debatable that a speed of 12 knots in a fog of the density which prevailed at the time of the collision in the instant case would be wholly unwarranted and immoderate. Indeed, many times this court has held that a very much less speed than 12 knots is an immoderate speed. The Columbia, supra; The H. F. Dimock, 77 Fed. 226, 23 C. C. A. 123; The Hilton (D. C.) 213 Fed. 997; The Rosaleen, 214 Fed. 252, 130 C. C. A. 622.

The government contends, however, that the Conner was justified in proceeding at 12 knots because of her tremendous backing power,

which would enable her to stop in a shorter distance than ordinary vessels. Her maximum speed was upwards of 30 knots. It is quite apparent that, whatever the backing power of the Conner may have been, it was of no avail here. That speed in this dense fog brought her into collision in a few seconds before her engine power could even be brought into play. The distance that the ships were visible to each other in the fog and the speed at which they were approaching and traversing the space between them are the real factors in the present problem. How futile is engine power in stopping or reversing, if the colliding vessels are upon each other in a few seconds of time, before the power can be brought into play. In The Manchioneal, 243 Fed. 801, 156 C. C. A. 313, the Circuit Court said:

" * * * Speed is always excessive in a vessel that cannot reverse her engines and come to a standstill before she collides with a vessel that she ought to have seen, having regard to fog density"—citing cases.

In The Haven (C. C. A.) 277 Fed. 957, the court said:

"A vessel navigating in a fog must go no faster than will permit her to stop within the distance she can see ahead." Page 959.

In The City of Norfolk (C. C. A.) 266 Fed. 641, the court said:

"In such navigation 'moderate speed' means speed so slow that the vessel can be stopped within the distance at which another vessel can be seen."

At the rate of 12 knots, the Conner was making approximately 1,200 feet per minute, or 300 feet in about 15 seconds. According to the witnesses, the boats, when visible to each other, were at most not over 150 to 300 feet apart. According to the commander's testimony, it would have been impossible to stop the Conner's speed of 12 knots at the point when they became visible. It may be speculation to endeavor to estimate what might have been done, had the Conner been proceeding slower; but we are dealing with what actually happened at a speed which the court believes was highly excessive under the circumstances, with the known result.

In the case of Watts v. U. S., supra, the warship Columbia was proceeding at about 6 knots per hour. The vessel with which she collided, the Foscolia, was not seen by any one on the Columbia until she was within 75 yards.

The Esperanza claims that the Conner was further at fault in failing to obey further provisions of article 16 of the International Rules, wherein it is provided that—

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel, the position of which is not ascertained, shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

This rule is, of course, applicable to the Esperanza, as well as to the Conner. In view of the excessive speed of the Conner, which I believe was the proximate and contributing cause of the collision, the Esperanza's failure to wholly stop her engines recedes in importance. It is not clear that the Conner heard the Esperanza's first fog signal, although the commander says he heard a sound which he thought might

be a fog signal. Although his sense of hearing indicated that it might be a fog whistle, no change of speed took place.

In Lie v. San Francisco & Portland S. S. Co., 243 U. S. 291, 37 Sup. Ct. 270, 61 L. Ed. 726, the master of the Selja attempted to excuse his failure to stop as required by article 16 by saying that, when he first heard the faint signal from the approaching vessel, he thought it might be a fog horn on the shore. The court, however, overruled the Selja's contention and held that the provisions of article 16 were mandatory, and required all vessels to stop their engines immediately. The same argument, however, as to the duty of the Esperanza, might be applied to her, unless the circumstances of the case do not so admit. Neither of the navigators was free to substitute his judgment for the positive requirements of the rule. A former navigation rule vested the navigator with a degree of discretion. The present rule is mandatory, and is positive law.

It is also true that the position of a vessel whose fog signal is heard must be ascertained before proceeding. Three elements are involved, indeed, before proceeding, bearing, distance, and course. Whatever we might say, however, in regard to the duty to stop, it seems to me that the paramount negligence—indeed, the proximate cause of the collision— was the excessive speed of the Conner and her failure to observe the rule regarding speed in fog. It is admitted by the commander of the Conner that, had her speed been 4 knots, the collision would not have occurred. The 12-knot speed had continued for quite a time before the collision, and brought her swiftly to the point of collision.

In view of the court's conclusion, I do not deem it necessary to consider the question as to whether the Conner was at fault for changing her course before the position and course of the Esperanza had been ascertained. The commander of the Conner hard-aported his helm as soon as the Esperanza's "string of lights" broke into view, and he admitted that in so doing he "gambled" on the Esperanza's course. However, I think it is proper to conclude that the error, if it was error, was committed at the moment of collision, and may be regarded with less strictness than one committed when the vessels are more distant from each other.

In like manner, reference might be made to the alleged contention that the Conner was at fault for failing to reverse her engines. This contention, however, is of interest more particularly because the Conner contends that she was justified in maintaining a speed of 12 knots because of her tremendous backing power. That tremendous backing power, which was not exercised at the moment of crisis, disposes of the argument that the speed was excusable. The potential power was neither brought into play, nor in all human probability could it have had any effect in avoiding the collision, if used.

In considering the responsibility of the Esperanza, the court does not deem it necessary to consider the charge that she was navigated by persons not wholly competent. The evidence is to the contrary, and this contention requires no consideration; but the question as to whether or not the Esperanza should have stopped her engines when she heard the fog signal of the Conner requires consideration.

For more than an hour prior to the collision the evidence satisfies the court that the Esperanza had been making perhaps 3 knots, which was barely steerageway. Not only was that the testimony of the Esperanza's witnesses, but it is also supported by the Esperanza's engine room slate. "The ship was turning over just as slow as the engine can be turned."

Assuming that the burden also rests upon the Esperanza of showing, not merely that her failure to stop her engines when she heard the signal of the Conner might not have been one of the causes, or rather that it could not have been one of the causes of the collision, the record convinces me that that burden has been sustained. Had she stopped her engines, she would have lost steerageway entirely, and "could not have been maneuvered." The failure of the Esperanza to stop her engines, assuming that it was her duty so to do, could not have been one of the causes of the collision. It was the gross negligence on the part of the Conner which accounts for the collision. In The City of New York, 147 U. S. 72, at page 85, 13 Sup. Ct. 211, 216 (37 L. Ed. 84), Mr. Justice Brown said:

"Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel."

The Conner did not stop her engines when the commander "thought" he heard a whistle when proceeding at 12 knots, nor yet did he reverse his engines at any time either before or after the Esperanza became visible. He did, however, change his course. It now appears that, had the rudder been put over exactly the opposite way, it would have "worked out better," as the commander said. However, these acts were done in extremis, and ought not to be considered faults of navigation.

The excessive speed of the Conner, particularly in its relation to the bare steerageway of the Esperanza, leads me to the conclusion that the total stoppage of the Esperanza's engines would not have prevented the collision, nor yet did that failure on her part in any way contribute to it. The Esperanza, at her speed, would have moved a negligible distance in the time that the Conner would have traversed a very considerable distance. The relation between two moving objects with differences of speed, such as these two vessels, is similar to the relation of an almost stationary object and a moving object. The negligence of the Conner continued to operate as an efficient cause until the moment of the collision.

The libel of the United States against the steamship Esperanza should be dismissed, with costs, and a decree will be entered in favor of libelant.