**STEFFENS v. UNITED STATES.**

**UNITED STATES v. STEFFENS.**

Circuit Court of Appeals, Second Circuit.
April 8, 1929.

No. 253.

Manton, Circuit Judge, dissenting.

Charles H. Tuttle, U. S. Atty., and Charles E. Wythe, both of New York City, for the United States.

Bigham, Englar, Jones & Houston, of New York City (T. Catesby Jones and Leonard J. Matteson, both of New York City, on the brief), for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). ▮ We are concerned only with the faults of the Aalsum, which are charged to be, first, an "immoderate" speed; and, second, failing to stop her engines upon hearing the Dannedaike's signals—both violations of article 16, as it has stood since 1889. The first depends upon whether she could stop her way with such visibility as existed after sighting another vessel. The Nacoochee, 137 U. S. 330, 11 S. Ct. 122, 34 L. Ed. 687; The Manchioneal, 243 F. 801 (C. C. A. 2); The Haven, 277 F. 957 (C. C. A. 2); The Esperanza (C. C. A.) 16 F.(2d) 945. That duty is, however, correlative with the duty of the other vessel to do the same. The Umbria, 166 U. S. 404, 417, 17 S. Ct. 610, 41 L. Ed. 1053. The rule is not theoretically adequate in all cases; though each vessel be in such reserve that she can check her way before she reaches the place at which the other appears, it does not follow that they cannot collide. The point of meeting may be such that they will both reach it, though each could have stopped before reaching the place where she could first have sighted the other. However, it is the only practicable rule, and it is the law.

▮ The only testimony is from the Aalsum, except that of the Dannedaike's master, who swore that the approaching ship seemed to him to be moving at 12 miles an hour. Such estimates are notoriously unreliable, and cannot prevail over the testimony of the other ship, unless this is in some way discredited. The story of the Aalsum is that she had been steaming at about 7½ knots till she heard the Dannedaike's first signals, some 15 minutes before the collision. Thereupon she reduced to about 3½ knots an hour, half speed, and so continued till the Dannedaike's lights appeared on her port bow through the fog. While we are, of course, acutely aware of the doubt which must attach to any ship's version of her own navigation, we do not see how we can reject this, which was pure fabrication, if not true. It is attested by the master, the engineer, and the log.

▮ The weather was not extremely thick. The Aalsum's master and third officer say that the visibility was about 1,700 to 2,000 feet; the Dannedaike's master and chief engineer, that it was about 700 feet. Even if we say that it was only 1,200 feet, the fault of the Aalsum is not proved, for she could have stopped within that distance at that speed; at least, that is the only testimony. The appellant has the burden, and has not made out a case as to this fault; the circumstances did not disprove the Aalsum's story, for the Dannedaike's speed was so great and her action so tardy, that these alone could account for all that happened.

▮ The appellant charges her with fault for her earlier speed, and with this we are in accord; but, if the times recorded in the engine room are correct, it seems to us that it could not have contributed. Her slow speed signal was at 10:05, and the collision was at 10:19. A lapse of nearly a quarter of an hour must have run off the higher speed, and made her dependent for her forward motion upon the power which the propeller continued to give. It is, of course, true that, the appellant having proved a violation of the rule, the burden rests upon the appellee to show that it did not contribute to the collision. There is therefore some plausibility in the argument that the Aalsum has not shown that her higher speed was run off. Yet we must not press that principle too far; it appears to us mere speculation to suppose that, after so long a time, she still continued to carry more than half speed. The evidence is positive and appears to us inherently probable.

▮ A more perplexing question is her failure to stop. If the Dannedaike's signal came

from "apparently" forward of her beam, this duty was imperative under these circumstances, for nothing prevented that action. In fact, the signals came from about two points forward of her beam, and, if that had been the test, she would be cast. It is not, and it would have been an impracticable duty to impose. A fog conceals the direction of sound and the place of its origin; a signal only two points forward of the beam might easily be mistaken for one coming from abeam, or of ambiguous direction. We read the rule as imposing an absolute duty only when the ship believes that the signal comes from ahead. When the direction is uncertain, navigation is left (as it was before 1889) to the master's judgment, except that the speed must in all cases be "moderate."

None of the cases cited present this situation; in all, the signal came "apparently" from forward of the beam, and the rule was necessarily enforced without condition, as, for example, in Lie v. San Francisco & Portland S. S. Co., 243 U. S. 291. A master uncertain of the direction may do worse by stopping than by going on. Suppose it turns out that the approaching vessel is coming on at higher speed than he, and upon a crossing course, though abaft his beam. He may stop in her track and provoke a collision, which he would otherwise escape; or, if she does her duty and stops, hearing his signal forward of her own beam, if he keeps on, he will move out of range, as he cannot do if he stops. It is true that all sorts of situations are possible, but we must accept the judgment of those exceptionally well qualified persons who quite deliberately changed the rule. They did not make the duty imperative in cases of doubt.

The evidence from the Aalsum of the direction of the signals is unsatisfactory, but in that respect quite what we should expect, considering the actual position of the ships. They vaguely described them as "broad on the port side," and while we attach no importance to the master's answer on cross-examination that they were not forward of his beam, we think it entirely likely that they could not be fixed at all. Only if the rule required the engines to be stopped, when that was true, could we say that she was in fault.

We cannot disguise the fact that the faults of the Dannedaike are so plain as to make us slow to consider too curiously those of the Aalsum. This is not because she has confessed them; we should be sorry to lay a penalty upon frankness, where frankness is so uncommon. But the testimony of her master leaves no possible question that her navigation was reckless and inconsiderate of the safety of others. She is not, therefore, warranted in invoking an overscrupulous search for possible faults on the part of her adversary.

Decree affirmed.

MANTON, Circuit Judge (dissenting). The Aalsum was guilty of faults of navigation which require a modification of this decree for damages against one vessel. It was conceded by the appellant that the Dannedaike was in part responsible for the collision. There is no sound reason to excuse the Aalsum. She was governed by article 16 of the International Rules, requiring her in a fog to go at a moderate speed, having careful regard for existing circumstances and conditions. A fog signal was heard apparently forward of her beam, the position of which signaling vessel she was unable to ascertain, and she failed to navigate with caution until the danger of collision was over. Prior to hearing the fog signals, she was running at full speed; she had visibility for but 2,000 feet. She heard the fog signal at 10:05, and her engines were slowed and continued under slow speed until 10:15, when the Dannedaike was sighted. She then went full speed ahead, with her helm hard aport, and continued for about a minute, and her engines were put full speed astern at 10:16, and the collision occurred at 10:19.

It is apparent that, having reversed her engines for about three minutes, she had considerable headway at the time of collision, for she continued on across the bow of the Dannedaike and disappeared in the fog. She continued reversing for about five minutes after the collision, finally gathering sternway, and nearly backed into a second collision with the Dannedaike. The latter was then stopped, dead in the wake of the Aalsum. For these violations she is at fault, within the principle of The Selja, 243 U. S. 291, 37 S. Ct. 270, 61 L. Ed. 726; The Esperanza (C. C. A.) 16 F.(2d) 945; The Suffolk (C. C. A.) 258 F. 219; The Haven (C. C. A.) 277 F. 957; and The Manchioneal (C. C. A.) 243 F. 801. If she had stopped her engines in the first instance, when hearing the signal and while enveloped in the fog, she probably would not have reached the spot of the collision, and the other vessel would have gone out of danger of the collision. The Britannia, 153 U. S. 130, 14 S. Ct. 795, 38 L. Ed. 660; The Georgic (D. C.) 180 F. 863. These reasons require a modi-

fication, and both vessels should be held at fault.

I dissent from the prevailing opinion, which exonerates The Aalsum.